# Illinois Official Reports

## Appellate Court

---

### *People v. Baldwin*, 2014 IL App (1st) 121725

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. WILLIE BALDWIN, Defendant-Appellant. |
| District & No. | First District, Sixth Division<br>Docket No. 1-12-1725 |
| Filed | August 15, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's convictions for aggravated criminal sexual assault and aggravated criminal sexual abuse were upheld where defendant waived review of the ruling on the admission of the diagnosis of the victim's personality disorder by failing to present an offer of proof as to the basis for the diagnosis, any error was harmless in view of the overwhelming evidence of defendant's guilt and the extensive cross-examination the trial court allowed as to the victim's mental health, and the trial court did not err in accepting the testimony of the State's DNA expert over that of the defense expert. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 07-CR-1301; the Hon. Timothy J. Joyce, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Michael J. Pelletier and Jonathan Yeasting, both of State Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Mary L. Boland, and Samuel C. Ray, Assistant State's Attorneys, of counsel), for the People.

Panel

PRESIDING JUSTICE ROCHFORD delivered the judgment of the court, with opinion.
Justices Lampkin and Reyes concurred in the judgment and opinion.

**OPINION**

¶ 1    Following a bench trial, defendant, Willie Baldwin, was convicted of two counts of aggravated criminal sexual assault and one count of aggravated criminal sexual abuse. The trial court sentenced defendant to two consecutive 15-year terms of imprisonment for the aggravated criminal sexual assault convictions and one consecutive 3-year term of imprisonment for the aggravated criminal sexual abuse conviction. On appeal, defendant contends: (1) the trial court erred in excluding evidence of the complainant's diagnosis of antisocial personality disorder; (2) his trial counsel committed ineffective assistance; and (3) the trial court erred in admitting evidence of an unrelated sexual assault against a third person on a propensity theory. We affirm.

¶ 2    Defendant was charged with one count of armed habitual criminal, four counts of aggravated kidnapping, one count of armed robbery, six counts of aggravated criminal sexual assault, and four counts of aggravated criminal sexual abuse against the victim, E.W. Prior to trial, the State filed a motion *in limine* to admit certain other-crimes evidence, specifically, of defendant's aggravated criminal sexual assault of a second victim, D.D., approximately six months prior to E.W.'s assault. The motion was made pursuant to section 115-7.3 of the Code of Criminal Procedure of 1963 (Criminal Code) (725 ILCS 5/115-7.3 (West 2010)), which applies, in relevant part, to a defendant who is accused of aggravated criminal sexual assault. Section 115-7.3(b) provides that evidence of defendant's commission of another aggravated criminal sexual assault "may be admissible (if that evidence is otherwise admissible under the rules of evidence) and may be considered for its bearing on any matter to which it is relevant." 725 ILCS 5/115-7.3(b) (West 2010). Section 115-7.3(c) further provides:

> "In weighing the probative value of the evidence against undue prejudice to the defendant, the court may consider:
>
> > (1) the proximity in time to the charged or predicate offense;
> >
> > (2) the degree of factual similarity to the charged or predicate offense; or
> >
> > (3) other relevant facts and circumstances." 725 ILCS 5/115-7.3(c) (West 2010).

¶ 3       The trial court here weighed the factors mentioned in section 115-7.3(c) and granted the State's motion, ruling that the evidence of defendant's aggravated criminal sexual assault against D.D. was admissible in E.W.'s case to show his propensity to commit sex offenses. (We will discuss the basis of the trial court's ruling in more detail later in this opinion.) The trial court granted the State's motion despite the fact that when D.D.'s case went to trial, the jury there acquitted defendant of aggravated criminal sexual assault alleging forced oral penetration and was unable to reach a verdict on a second count alleging forced vaginal penetration.

¶ 4       On the day of defendant's bench trial in the E.W. case, defendant made an oral motion *in limine* to admit evidence that in 2011, the University of Utah Assessment and Referral Services (hereinafter, Assessment and Referral Services) had diagnosed E.W. with antisocial personality disorder following her arrest for several offenses in Utah. Defendant explained that he had not made the motion earlier because he had only recently received the report from Assessment and Referral Services containing E.W.'s diagnosis. Defendant sought a preliminary ruling from the trial court that E.W.'s diagnosis of antisocial personality disorder was relevant and admissible with regard to her truthfulness. Defendant also sought guidance from the trial court regarding the best way to introduce E.W.'s diagnosis into evidence in the event it found the diagnosis relevant and admissible. Defendant stated:

> "If you should find her antisocial diagnosis relevant, we would either need [E.W.] to endorse that she has information that she had been diagnosed with that or a stipulation from the State as to that diagnosis. Absent those things I don't think the court can consider them in which case we would have to hire an expert.
>
> Of course, since we received this information late, we have not had the ability to contact or procure an expert and we're ready for trial. And so we probably cannot answer ready for trial unless we can sort of lay some ground work for how that evidence would come in. The expert would either be the clinician herself, would have to be flown in from Utah or, like I said, if there was a stipulation as to the diagnosis itself and if your Honor were to take judicial notice of the definition of antisocial personality disorder, that would be satisfactory to us."

¶ 5       The record on appeal contains neither any written motion *in limine* seeking the preliminary finding of admissibility with regard to E.W.'s diagnosis, nor the report from Assessment and Referral Services containing the diagnosis and the reasons therefore.

¶ 6       The trial court ruled that evidence of E.W.'s diagnosis was inadmissible under section 115-7.1 of the Criminal Code (725 ILCS 5/115-7.1 (West 2010)), which prohibits a court from requiring a witness who is the victim of an alleged sex offense to undergo a psychiatric or psychological examination. However, the trial court also ruled that defendant could cross-examine E.W. regarding her specific conduct leading to the diagnosis of antisocial personality disorder.

¶ 7       I. Trial

¶ 8       A. E.W.'s Testimony Regarding the Sexual Assault

¶ 9       At trial, E.W. testified she was 24 years old at the time of trial in 2011 and had been living in Salt Lake City, Utah, since the end of 2006. On February 3, 2003, E.W. was 15 years old and living with her grandmother at 53rd and Hermitage Avenue in Chicago. At

about 9 p.m. that evening, E.W. was waiting at the bus stop at 53rd Street and Ashland Avenue. When the bus did not come, E.W. began walking south on Ashland Avenue toward the next bus stop. As she was walking, she heard defendant, who was sitting in a car facing north on Ashland Avenue, "holler" at her to come over to his car. E.W. refused because she did not know defendant. Defendant drove off north on Ashland Avenue and E.W. continued walking south on Ashland Avenue.

¶ 10    E.W. testified that she again saw defendant as he drove up a side street behind her, turned on Ashland Avenue, and pulled up alongside her with his passenger window down. Defendant leaned over the passenger seat and pulled out a gun with his left hand and pointed it at E.W. Defendant demanded that E.W. get in the car and he threatened to shoot her if she ran away.

¶ 11    E.W. testified she complied and entered his car. Defendant placed the gun in the driver's side door panel and drove south on Ashland Avenue. As he was driving, defendant asked E.W. whether she had any money in her pocket. E.W. said no. Defendant responded that he would search E.W., and that if she had any money, he would kill her. E.W. then gave defendant her money, approximately $60 or $70. Defendant offered her a "primo" cigarette and beer; she refused.

¶ 12    E.W. testified defendant drove into an alley and forced her to perform oral sex on him while he remained in the driver's seat. Defendant then ordered E.W. to climb over into the back seat, where he forced her to engage in sexual intercourse (penis to vagina) with him. During the course of this, defendant touched her breast with his mouth.

¶ 13    E.W. testified that after defendant finished having sex with her, they returned to the front seat of the car and defendant drove out of the alley. Defendant told E.W. that he had been watching her for the last two months and that now he was going to drive her to the west side of Chicago and kill her. E.W. did not attempt to get away at that point because, in addition to the gun, defendant also "had a knife and one of them arrow-bow crosses up there in that car."

¶ 14    E.W. testified that at 68th Street and Damen Avenue, defendant came to a stop to avoid hitting two people who were crossing the street. Taking advantage of the opportunity, E.W. jumped out of the car and ran to a gas station near 67th Street and Ashland Avenue and used a pay phone to call the police.

¶ 15    Officer Maria Hernandez testified she was dispatched to 68th Street and Damen Avenue at around 9 p.m. on February 3, 2003, where she saw E.W., who was very upset, distraught, and crying. E.W. stated she had been sexually assaulted. Officer Hernandez asked E.W. some "brief questions" and then put her in the squad car and drove her to the University of Chicago Hospital.

¶ 16                    B. Testimony Regarding the Investigation

¶ 17    E.W. testified that at the hospital, doctors examined her and a criminal sexual assault kit was administered to her. The parties stipulated that nurse Harwood would testify that the criminal sexual assault kit included the taking of oral, vaginal, and rectal cultures.

¶ 18    Officer Hernandez spoke with E.W. at the hospital and made a police report based on that conversation. E.W. testified she provided a description of defendant as a dark-skinned man with brown eyes and a beard, wearing a khaki jogging suit, a leather jacket, black gloves, and driving a white car. Officer Hernandez testified that during the conversation, E.W. never

mentioned that defendant had touched her breasts, nor did she state that defendant had told her he had been watching her for two months and that he was going to take her to the west side of Chicago to kill her. Instead, E.W. stated that defendant had dropped her off on the south side of Chicago near 68th Street and Damen Avenue, after which she walked to 67th Street and Ashland Avenue. E.W. testified that Officer Hernandez was mistaken in her recollection of their conversation and that defendant had not voluntarily dropped her off after the sexual assault but, rather, she had escaped from his car.

¶ 19    Nicholas Richert, who was formerly a forensic scientist for the Illinois State Police, testified that in 2006, defendant's DNA registered as a hit in the Combined DNA Index System (CODIS) for the sexual assault of the other-crimes victim, D.D. On December 8, 2006, defendant was arrested at 63rd Street and Ashland Avenue. E.W. testified that on December 10, 2006, she went to the police station and picked defendant out of a lineup as the man who had sexually assaulted her.

¶ 20                                    C. The Forensic Evidence

¶ 21    The parties stipulated that if called to testify, Charles Widerstrom, an evidence technician with the Chicago police department, would testify that on February 4, 2003, he went to the emergency room of the University of Chicago Wyler's Hospital and recovered E.W.'s sealed criminal sexual assault kit. Maria Fiorelli, a forensic scientist with the Illinois State Police, would testify she examined E.W.'s criminal sexual assault kit, which included vaginal, oral and rectal swabs. Ms. Fiorelli discovered semen on the vaginal and rectal swabs.

¶ 22    The parties stipulated that if called to testify, Melissa Thompson, a DNA analyst employed by Orchid Cellmark, would testify she performed a Polymerase Chain Reaction/Short Tandem Repeat DNA analysis on the samples retrieved from E.W. and obtained a DNA profile suitable for comparison from the blood standard collected from E.W. Ms. Thompson used differential extraction DNA analysis on E.W.'s vaginal swabs that yielded a nonsperm fraction and a sperm fraction of DNA. In the nonsperm fraction, Ms. Thompson identified a female DNA profile that matched E.W.'s DNA. From the sperm fraction, Ms. Thompson deduced a single male DNA profile which was summarized in a report and sent to the Illinois State Police.

¶ 23    The parties stipulated that if called to testify, Chicago police evidence technician Abelardo Rodriguez would testify that on December 10, 2006, he collected a buccal swab standard from defendant and delivered it to the Chicago police department forensic services division. The buccal swab was then sent to the Illinois State Police crime lab for DNA analysis.

¶ 24    The parties stipulated that if called to testify, forensic scientist Nicholas Richert would testify that in 2007 he received defendant's buccal swab standard and the DNA data generated by Orchid Cellmark for the vaginal swabs collected from E.W. Mr. Richert conducted DNA analysis on defendant's buccal swab standard and obtained a DNA profile suitable for comparison purposes. Mr. Richert compared the deduced male DNA profile from E.W.'s vaginal swabs with defendant's DNA profile, and concluded within a reasonable degree of scientific certainty that the male DNA profile from E.W.'s vaginal swabs matches defendant's DNA profile. Defendant's profile is only expected to occur in approximately "1 in 170 quadrillion black, 1 in 1 quintillion white, or 1 in 1.4 quintillion Hispanic unrelated

individuals."

¶ 25                    D. E.W.'s Criminal Background and Mental Health Evaluation

¶ 26    In Utah, E.W. pleaded guilty to attempted criminal mischief, a Class A misdemeanor, in 2008 and was sentenced to 24 months' probation. E.W. subsequently violated her probation when she tested positive for methamphetamines, THC, and cocaine and was sentenced to 200 days in jail.

¶ 27    In March 2011, E.W. also pleaded guilty to attempted possession with intent to distribute a controlled substance, a Class A misdemeanor, and was sentenced to 24 months' probation. In May 2011, E.W. pleaded guilty to retail theft, a Class B misdemeanor, and received a fine and 12 months' probation. E.W. received consideration at sentencing by the Utah courts for her subsequent testimony against the defendant here.

¶ 28    As part of her sentence for retail theft, E.W. was ordered to undergo a mental health evaluation at Assessment and Referral Services. On September 29, 2011, E.W. received a mental health evaluation by Lisa Croudy, an associate professional counselor at Assessment and Referral Services. The parties stipulated that if called to testify, Ms. Croudy would testify that during the evaluation, E.W. stated she first smoked marijuana once at age 15 and again at age 16, after which she used marijuana every other day until it made her feel "weird" and then she smoked marijuana once a month until she was 21 years old.

¶ 29    E.W. testified, contrary to the stipulated testimony of Ms. Croudy, that she only smoked marijuana one time. She tried an ecstasy pill two times. E.W. testified she had not used cocaine or methamphetamine by themselves, but that one of the ecstasy pills contained cocaine and methamphetamine. E.W. admitted that when officers searched her home in Utah in August 2010 and arrested her for possession with intent to deliver, she told an officer that the crack cocaine recovered from her home was for her personal use.

¶ 30    The parties stipulated that if called to testify, Sharron Johnson would testify she is a licensed clinical social worker at Valley Mental Health in Salt Lake City, Utah, and she interviewed E.W. on October 17, 2011. In the interview, E.W. stated she believes in the paranormal and she recounted an auditory hallucination of hearing her name called. In an interview with Ms. Johnson on October 27, 2011, E.W. stated she has seen ghosts all her life.


¶ 31                                        E. Other-Crimes Evidence

¶ 32    At trial, the State introduced evidence of defendant's prior sexual assault of D.D., as propensity evidence. D.D., who was 37 years old at the time of trial here in 2011, testified that on July 27, 2002, just before 10 p.m., she was walking at 16th Street and Pulaski Avenue on her way to a party. A black male who she did not know approached her in his car and pointed a gun at her. D.D. was afraid that she might get shot, so she entered his car. The man put the gun to her side and began driving. D.D. acknowledged that she had previously testified, at the trial on her case against defendant, that she did not remember if she had seen a gun before entering the car.

¶ 33    D.D. testified they drove to the south side of Chicago and stopped near 49th Street and Halsted Avenue. The man climbed on top of D.D. and forced her to engage in oral and vaginal sex. D.D. could not remember if the man took any money from her, but she did remember that he took her State identification.

¶ 34    D.D. testified that after the man finished having sex with her, he let her go. She ran down the street to a pay phone and called the police. The police arrived and took her to the hospital where a sexual assault kit was completed.

¶ 35    The parties stipulated that on December 9, 2006, D.D. viewed a lineup at the police department. Defendant was one of the persons in the lineup. D.D. did not identify anyone in that lineup as her assailant.

¶ 36    Mr. Richert testified that in 2006 he was provided with a buccal standard from defendant. Mr. Richert was able to generate a DNA profile from that standard suitable for comparison purposes. Mr. Richert later compared defendant's DNA profile to the DNA profiles identified in D.D.'s vaginal swabs by Orchid Cellmark. Mr. Richert was able to identify a major male DNA profile in D.D.'s vaginal swabs that matched the DNA profile of defendant. Mr. Richert testified that "[t]he major male DNA profile identified in the vaginal swabs would be expected to occur in approximately 1 in 170 quadrillion black, 1 in 1 quintillion whites or 1 in 1.4 quintillion Hispanic unrelated individuals."

¶ 37    Defendant's expert witness, Dr. Karl Reich, challenged Mr. Richert's DNA analysis in D.D.'s case and testified that the vaginal swabs used by Orchid Cellmark lacked enough DNA evidence to deduce a single major DNA profile to compare against defendant's DNA. Dr. Reich conceded that defendant was not eliminated as a DNA match, but claimed the male DNA profile that matched defendant's DNA was only one possible profile that could have been deduced for the vaginal swabs.

¶ 38                                    F. Defendant's Case-in-Chief

¶ 39    Defendant testified that on February 3, 2003, he lived at 6401 South Oakley, one block from 63rd Street and Ashland Avenue. At approximately 7 p.m. on that date, defendant walked east on 63rd Street, in order to catch a bus at 63rd Street and Oakley Avenue to go to a friend's house. The bus never came, so defendant continued walking east on 63rd Street in the direction of Damen Avenue. He saw E.W. standing on 63rd Street and Seeley Avenue, attempting to flag down cars. Defendant stated that he knew the area around 63rd Street and Seeley Avenue is regularly frequented by prostitutes soliciting sex.

¶ 40    Defendant testified he walked over to E.W., and she said, "What's up with you, man? You want to get down with me or what?" Defendant understood E.W. to be saying that she was "selling her body." Defendant asked E.W. how much she was charging and she replied $10. Defendant asked where they were going to go to have sex, and E.W. told defendant to follow her.

¶ 41    Defendant testified E.W. took him to an alley along 63rd Street between Seeley Avenue and Damen Avenue and they went into an unlocked garage. Defendant handed E.W. a $10 bill and she put it in her pocket. They took off their clothes and laid down on a couch that was inside the garage. The two then had sexual intercourse. Defendant did not use a condom. They did not have oral sex.

¶ 42    Defendant testified that after having sex, they put their clothes back on and walked out of the garage and into the alley. Defendant pulled about $290 from his pocket to get money for the bus. When E.W. saw the amount of money in defendant's hand, she said she should have charged him more than $10. Defendant told her he had given her what she had asked for. E.W. then responded that she would call the police unless defendant gave her an additional

$30. Defendant told her to "[d]o what you feel like you've got to do" and he walked away and caught the bus at Damen Avenue.

¶ 43    Following defendant's testimony, the trial court admitted into evidence a certified copy of defendant's Class 4 felony conviction for domestic battery in 2005.

¶ 44                        G. The Trial Court's Findings

¶ 45    At the conclusion of the trial, the trial court found that E.W.'s testimony regarding defendant's sexual assault of her was compelling and credible and corroborated by her prompt outcry to Officer Hernandez and the DNA evidence. The trial court also credited Mr. Richert's testimony over Dr. Reich's testimony and found that the other-crimes evidence of defendant's sexual assault on D.D. established defendant's propensity to commit sex crimes. The trial court convicted defendant of two counts of aggravated criminal sexual assault (for penis to vagina contact, and for penis to mouth contact) and one count of aggravated criminal sexual abuse (for mouth to breast contact) and sentenced defendant to two consecutive 15-year terms of imprisonment for the aggravated criminal sexual assault convictions and one consecutive 3-year term of imprisonment for the aggravated criminal sexual abuse conviction. Defendant appeals.

¶ 46                             II. The Appeal

¶ 47    First, defendant argues the trial court erred in denying his oral motion *in limine* seeking a preliminary determination that the diagnosis by Assessment and Referral Services that E.W. has antisocial personality disorder was relevant and admissible at trial to show her untruthfulness. The Diagnostic and Statistical Manual of Mental Disorders, fourth edition, text revision (DSM-IV-TR) defines antisocial personality disorder as "a pervasive pattern of disregard for and violation of the rights of others occurring since age 15 years, as indicated by three (or more) of the following":

> "1) failure to conform to social norms with respect to lawful behaviors as indicated by repeatedly performing acts that are grounds for arrest
>
> 2) deceitfulness, as indicated by repeated lying, use of aliases, or conning others for personal profit or pleasure
>
> 3) impulsivity or failure to plan ahead
>
> 4) irritability and aggressiveness, as indicated by repeated physical fights or assaults
>
> 5) reckless disregard for safety of self or others
>
> 6) consistent irresponsibility, as indicated by repeated failure to sustain consistent work behavior or honor financial obligations
>
> 7) lack of remorse, as indicated by being indifferent to or rationalizing having hurt, mistreated, or stolen from another." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 706 (4th ed., text rev. 2000).

¶ 48    At the hearing on the *in limine* motion, defendant argued that E.W.'s diagnosis of antisocial personality disorder called into question her truthfulness and therefore should be admitted at trial. The trial court disagreed, finding that E.W.'s diagnosis was inadmissible under section 115-7.1 of the Criminal Code, which states:

- 8 -

"Except where explicitly authorized by this Code or by the Rules of the Supreme Court of Illinois, no court may require or order a witness who is the victim of an alleged sex offense to submit to or undergo either a psychiatric or psychological examination." 725 ILCS 5/115-7.1 (West 2010).

¶ 49　　The trial court acknowledged that the examination resulting in E.W.'s diagnosis of antisocial personality disorder had already taken place in Utah as a condition of her probation and therefore did not technically fall within section 115-7.1, which prohibits the court from requiring a witness who is the victim of a sex offense to undergo a *future* psychiatric or psychological exam. However, the trial court stated that section 115-7.1 "evinces a legislative intent that not only should people not be subjected to such during the discovery process while the case is pending, but it is not a relevant area of inquiry for an alleged victim of an alleged sexual assault because it's not relevant."

¶ 50　　On appeal, defendant argues that the trial court misinterpreted the legislative intent underlying section 115-7.1. Defendant cites to *People v. Wheeler*, 151 Ill. 2d 298 (1992), in which our supreme court made the following findings regarding the legislative intent underlying section 115-7.1:

"Section 115-7.1 was intended to eliminate the defense practice of intimidating sex-offense victims through psychological examinations focusing on their competency and credibility as witnesses. During debate on section 115-7.1, the legislature noted the disparity of treatment accorded victims of sex-offense crimes as compared to victims of non-sex crimes. [Citation.] The legislature also expressed concern that defendants used court-ordered psychological examinations as a way to embarrass and intimidate sex-offense victims. [Citation.] By eliminating the defense tactic of requesting psychological examinations, section 115-7.1 places victims of sex crimes in the same position as victims of other crimes." *Id.* at 307-08.

¶ 51　　Defendant here argues that "[t]his kind of intrusive questioning by defense experts [to embarrass and intimidate sex offense victims] is plainly not what occurred when E.W. was examined at the behest of Utah state officials as a condition of her probation" and diagnosed with antisocial personality disorder. Accordingly, defendant argues that the trial court erred in finding that E.W.'s diagnosis of antisocial personality disorder was barred under section 115-7.1. Defendant argues that E.W.'s diagnosis was relevant and admissible to show her lack of truthfulness and to support defendant's theory that E.W. was a prostitute who made a false accusation of sexual assault because she was upset over the amount of money defendant paid her for her sexual services.

¶ 52　　In addressing defendant's argument, we note that "[w]hile mental health history is relevant as it relates to credibility, and is thus a permissible area of impeachment, before such evidence may be introduced, its relevance must be established." *People v. Plummer*, 318 Ill. App. 3d 268, 279 (2000). "The burden is on the party seeking to introduce the evidence to establish its relevance to the witness's credibility." *Id.* Thus, it was incumbent on defendant to establish how E.W.'s diagnosis was relevant to her veracity. At the hearing on defendant's *in limine* motion, defendant's only effort to establish the relevance of E.W.'s diagnosis to her veracity was to present the trial court with the DSM-IV-TR definition of antisocial personality disorder and to argue that a person with such a diagnosis "might be a liar."

¶ 53　　However, we note that the DSM-IV-TR lists seven factors that can lead to a diagnosis of antisocial personality disorder, three of which need to be present for the diagnosis to occur.

Only one of the seven possible factors that can lead to an antisocial personality disorder diagnosis, "deceitfulness," directly goes to E.W.'s truthfulness. Defendant failed to argue or make an offer of proof that the "deceitfulness" factor was present in E.W.'s diagnosis; in fact, defendant failed to make an offer of proof as to any of the specific factors that E.W. was found to have suffered from. "It is well recognized that the key to saving for review an error in the exclusion of evidence is an adequate offer of proof in the trial court. [Citations.] The purpose of an offer of proof is to disclose to the trial judge and opposing counsel the nature of the offered evidence *and to enable a reviewing court to determine whether exclusion of the evidence was proper.*" (Emphasis added.) *People v. Andrews*, 146 Ill. 2d 413, 420-21 (1992). In the absence of an offer of proof regarding the basis of E.W.'s diagnosis, and in the absence in the appellate record of the report from Assessment and Referral Services containing the basis of the diagnosis, we are unable to determine whether E.W.'s diagnosis of antisocial personality disorder was premised on her deceitfulness such that it would have been relevant and admissible to support defendant's theory that E.W. was falsely accusing him of sexual assault; accordingly, the issue of whether the trial court erred in finding that evidence of E.W.'s diagnosis was inadmissible is waived. *Id*. at 421. As defendant waived review of the trial court's ruling that E.W.'s diagnosis of antisocial personality disorder was inadmissible, we need not address the basis of said ruling, specifically, whether defendant's examination and diagnosis by Assessment and Referral Services falls within section 115-7.1.

¶ 54      Defendant contends no detailed offer of proof was made because the trial court told defense counsel that it was unnecessary. We disagree. At the hearing on the *in limine* motion, defense counsel told the trial court that he wanted guidance as to how he should prove up, during trial, E.W.'s diagnosis of antisocial personality disorder. The trial court subsequently ruled that the diagnosis was inadmissible under section 115-7.1. Defense counsel then stated "Since you've now ruled that we will not be able to get into the diagnosis or the–how they arrived at the diagnosis, the issue of whether I have to prove that up through an expert or a stipulation or a learned treatise, I think then becomes moot." The trial court responded, "I think so too because even if you did it by any of those mechanisms, it would still be irrelevant and still prohibited by the rationale underlying the existence of 115-7.1 in the first instance."

¶ 55      The foregoing colloquy between defense counsel and the trial court related to the type of proof that would have been necessary *at trial* to prove up E.W.'s diagnosis of antisocial personality disorder. The trial court stated that such a discussion of trial proof was moot because the evidence of E.W.'s diagnosis was not admissible. Defense counsel made no request that he be allowed to make a pretrial offer of proof regarding the factors underlying the diagnosis to preserve the issue for appellate review, nor did the trial court foreclose such an offer of proof.

¶ 56      Further, we note that any error in the exclusion of E.W.'s diagnosis of antisocial personality disorder was harmless, where the trial court permitted defendant to extensively cross-examine E.W. regarding her mental health and where the evidence against defendant was overwhelming. See *People v. Davis*, 185 Ill. 2d 317, 338 (1998) (the extent of cross-examination otherwise permitted and the overall strength of the prosecution's case are relevant factors in determining whether the exclusion of evidence was harmless).

¶ 57      Specifically, with regard to defendant's cross-examination of E.W., the trial court here stated during its ruling on defendant's motion *in limine* that defendant could "certainly

- 10 -

cross-examine [E.W.] about specific instances that she relates that lead some professional to conclude certain opinions." The trial court also ruled that "if she says [to the professional] that she hears voices, well, that's something that you may be able to bring out. If she says *** something to the effect that she sees ghosts, that's something you may well be able to bring out." Pursuant to the trial court's ruling, defendant presented considerable evidence at trial regarding E.W.'s mental health, including her auditory hallucination of hearing her name called, her prior drug use, and her belief in the paranormal.

¶ 58    With respect to the strength of the prosecution's case, we note that E.W. consistently identified defendant as her attacker and the trial court specifically found her testimony to be credible and "compelling." As a reviewing court, we cannot substitute our judgment for that of the trial court, which heard the witnesses and determined their credibility. *In re V.Z.*, 287 Ill. App. 3d 552, 565 (1997). The trial court also noted that E.W.'s testimony was corroborated by her "prompt outcry to Officer Hernandez very shortly after" the attack as well as the DNA evidence. Expert testimony established the fact of sexual intercourse between defendant and E.W.; the male DNA profile from E.W.'s vaginal swabs matched defendant's DNA profile, and such a profile was only expected to occur in 1 in 170 quadrillion black, 1 in 1 quintillion white, or 1 in 1.4 quintillion Hispanic unrelated individuals. In addition, there was the other-crimes evidence of defendant's aggravated criminal sexual assault on D.D. which was admitted to show defendant's propensity to commit sex crimes.

¶ 59    Given all the evidence brought out at trial regarding E.W.'s mental health, and the strength of the prosecution's case, we cannot say defendant was prejudiced by the exclusion of E.W.'s diagnosis of antisocial personality disorder. Any error in its exclusion was harmless.

¶ 60    Next, defendant contends his counsel provided ineffective assistance. To determine whether defendant was denied his right to effective assistance of counsel, we apply the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). Defendant must show, first, that "counsel's representation fell below an objective standard of reasonableness" (*id*. at 688), and second, that he was prejudiced such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different" (*id*. at 694).

¶ 61    Defendant contends that after the other-crimes evidence of his aggravated criminal sexual assault of D.D. was admitted under section 115-7.3, his counsel provided ineffective assistance by failing to introduce rebuttal evidence that the jury in the D.D. case had acquitted him of one of the two aggravated criminal sexual assault charges (alleging forced oral penetration against D.D.) while failing to reach a verdict on the other charge (alleging forced vaginal penetration). Defendant contends such rebuttal evidence should have been introduced under section 115-7.3(b) (725 ILCS 5/115-7.3(b) (West 2010)) (allowing defendant to present "evidence to rebut" other-crimes evidence).

¶ 62    In support of his claim of ineffective assistance, defendant cites *People v. Ward*, 2011 IL 108690. In *Ward*, the defendant there, Perry Ward, was convicted of the criminal sexual assault of M.M. *Id*. ¶ 2. During his trial, the trial court admitted evidence that Ward had also been involved in the criminal sexual assault of another woman, L.S. *Id*. ¶ 1. The evidence was admitted under section 115-7.3 to show his propensity to commit sex crimes. *Id*. When

Ward sought to have evidence admitted of his acquittal in L.S.'s case, though, the trial court rejected his request. *Id.*

¶ 63 On appeal to the supreme court, Ward argued the trial court erred in refusing to admit evidence that he had been acquitted of sexually assaulting L.S. *Id.* ¶ 21. The supreme court conducted a balancing test to weigh the probative value of admitting the acquittal evidence against the undue prejudice to Ward if the other-crimes evidence were admitted without the admission of the acquittal evidence. *Id.* ¶¶ 35-46. With respect to the probative value of admitting the acquittal evidence, the supreme court noted that "[w]ithout the benefit of even the general knowledge that [Ward] was acquitted of assaulting L.S., the jury could easily have been swayed after hearing only parts of the story. Here, the probative value of the acquittal evidence is in its ability to provide the jury with a more complete context for L.S.'s testimony. While the M.M. jury still had an independent duty to determine the credibility of her testimony and evaluate its weight, the acquittal evidence would have provided another part of the picture that was otherwise sorely absent." *Id.* ¶ 40.

¶ 64 With respect to the undue prejudice to Ward if the other-crimes evidence were admitted without the admission of the acquittal evidence, the supreme court noted:

"[T]he potential for prejudice is readily apparent from L.S.'s highly detailed testimony about [Ward's] alleged violent attack on her, followed by her statement that she had previously testified in another case. ***

     ***

Given the graphic nature of the depiction of [Ward's] alleged attack on L.S., the jury naturally would have assumed the State had pressed charges against [Ward], providing a *** likely context for L.S.'s prior testimony. Therefore, L.S.'s testimony left the jury to speculate whether those charges against [Ward] were ongoing or had already been resolved. The admission of evidence that [Ward] had been acquitted of assaulting L.S. would have put to rest that speculation and provided a context for her statements about having 'already' given testimony." *Id.* ¶¶ 41-43.

¶ 65 The supreme court found that "[d]ue to the inherently high, and often overly persuasive, probative value of such propensity evidence, the need to avoid unfair prejudice by providing a full context for the other-crimes testimony is readily apparent. Given the real possibility the jury would convict [Ward] based on his alleged prior bad acts alone, barring the acquittal evidence further enhanced the already high danger of undue prejudice against him." *Id.* ¶ 46. The supreme court concluded that "barring the admission of the acquittal evidence was an abuse of the trial court's discretion. The ruling was unreasonable under the facts and circumstances of this case." *Id.* ¶ 48.

¶ 66 In the present case, defendant argues that, pursuant to *Ward*, defense counsel should have introduced evidence of his acquittal in the D.D. case of one of the charges of aggravated criminal sexual assault (forced oral penetration) and of the inability of the jury to reach a verdict on the other charge (forced vaginal penetration).

¶ 67 The State counters that defense counsel committed no ineffective assistance in the present case, as he made the trial court aware, during pretrial proceedings, that the D.D. case resulted in an acquittal on the forced oral penetration count and a hung jury on the forced vaginal penetration count. Defendant responds that the trial court could not properly consider, at trial here, the result of D.D.'s case because said result was never introduced into evidence. See

*People v. Borrelli*, 392 Ill. 481, 492 (1946) (holding that evidence proffered only at a pretrial hearing may not be considered at trial as such evidence is "no part of the trial on the merits"). Defendant contends his counsel was ineffective for failing to introduce the result of D.D.'s case into evidence *at his trial* in the present case in order to rebut the other-crimes evidence of his aggravated criminal sexual assault against D.D.

¶ 68    We agree with defendant that defense counsel's failure to introduce the result of D.D.'s case into evidence at his trial here foreclosed the trial court from considering said result in rebuttal to the other-crimes evidence. However, we find no ineffective assistance in defense counsel's failure to offer the result of D.D.'s case into evidence in rebuttal to the other-crimes evidence, as defendant was not prejudiced thereby because he would have been convicted even if the rebuttal evidence had been introduced and entered into evidence. Specifically, the record indicates that although the trial court found that the other-crimes evidence of defendant's aggravated criminal sexual assault on D.D. established defendant's propensity to commit sexual crimes, the court's primary reason for convicting defendant related to E.W.'s credible testimony at trial regarding defendant's sexual assault of her, coupled with her outcry after the assault and the corroborative DNA evidence. In reaching this conclusion, we quote from the trial court's findings following defendant's trial:

> "[E.W.] testified regarding how it was that she was assaulted, taken off the street at gunpoint, put into this vehicle, transported to an alley, subjected to oral intercourse by force, vaginal intercourse by force. The offender kissed her breasts. *The testimony was compelling*.
>
> She made a prompt outcry to Officer Hernandez very shortly after this alleged incident. ***
>
> [Defense counsel] did an excellent job endeavoring to impeach [E.W.'s] testimony with her drug use [and with] [t]estimony concerning her criminal history. *** But in light of the physical evidence, the circumstances of her outcry, her identification of [defendant] almost four years later confirmed by the DNA evidence from her vagina, even her beliefs regarding the paranormal don't sway the court in connection with her credibility. I suppose we could snicker at someone's belief in ghosts, but we could probably snicker at all sorts of other religious beliefs. The fact that people have those beliefs, the fact that some might deem the beliefs in the paranormal and beliefs in ghosts to be indicative of delusions, there's no indication of any delusional activity by her in connection with this because the person she claims had sex with her we know did have sex with her, and we know that not from his own testimony, but from the DNA evidence adduced in connection with the rape kit, collection by the Chicago Police Department, and its analysis by the Illinois State Police. *And having listened to her testify, I believe her*." (Emphases added.)

¶ 69    We adduce from these comments that it was E.W.'s consistent testimony regarding defendant's sexual assault of her, in conjunction with her rapid outcry to Officer Hernandez and the corroborative DNA evidence, which convinced the trial court of E.W.'s credibility. The trial court's discussion of E.W.'s credibility was separate from its discussion of the other-crimes evidence of defendant's aggravated criminal sexual assault against D.D.; when making its credibility determination that it believed E.W.'s account that defendant had sexually assaulted her, the trial court made no reference to the other-crimes evidence. This indicates to us that the court would have convicted defendant based on E.W.'s testimony, the

- 13 -

testimony of Officer Hernandez, and the DNA evidence, even in the absence of the other-crimes evidence or even if the other-crimes evidence had been rebutted with evidence of his acquittal/hung jury in the D.D. case. Accordingly, defendant was not prejudiced by his defense counsel's failure to introduce evidence rebutting the other-crimes evidence, and therefore his claim of ineffective assistance fails.

¶ 70     Next, defendant contends the trial court erred in admitting the other-crimes evidence of his aggravated criminal sexual assault against D.D., because "[t]o allow evidence of [a] prior sexual offense for which an accused has been acquitted threatens notions of basic fairness, and falls outside of the plain language of [s]ection 115-7.3." Initially, we note defendant was acquitted on only one charge of aggravated criminal sexual assault (based on forced oral penetration) in the D.D. case; the jury was hung on the other charge of aggravated criminal sexual assault (based on forced vaginal penetration) in the D.D. case. Thus, the issue is whether, under section 115-7.3, defendant's acquittal on the oral penetration count in the D.D. case should have precluded the admission, here, of the other-crimes evidence on that count.

¶ 71     When interpreting a statute, our main objective is to determine and give effect to the legislative intent. *In re Marriage of Cozzi-DiGiovanni*, 2014 IL App (1st) 130109, ¶ 31. The most reliable indicator of the legislature's intent is the statutory language, which must be given its plain and ordinary meaning. *Id*. Our standard of review for the construction and application of a statute is *de novo*. *Id*.

¶ 72     Section 115-7.3 states in pertinent part that where defendant is accused of the "offense" of aggravated criminal sexual assault, evidence of his commission of another "offense" of aggravated criminal sexual assault "may be admissible (if that evidence is otherwise admissible under the rules of evidence) and may be considered for its bearing on any matter to which it is relevant." 725 ILCS 5/115-7.3 (West 2010). The plain language of the statute does *not* require that there have been a conviction on the other offense of aggravated criminal sexual assault in order for evidence of said offense to be admitted, nor does it state that evidence of the other offense may not be admitted where a trial on that offense resulted in an acquittal.

¶ 73     We further note that the mere fact of acquittal does not necessarily mean that defendant did not commit the alleged other offense; instead, it shows that the State was unable to prove every element of its case beyond a reasonable doubt. See *People v. Jackson*, 149 Ill. 2d 540, 550-51 (1992). The fact that the State was unable to prove every element of the other offense beyond a reasonable doubt when that case was brought to trial does not automatically foreclose its subsequent admission as other-crimes evidence against the defendant in a different case; our supreme court has held that the proof of other crimes committed by defendant need not be beyond a reasonable doubt but rather must be "more than a mere suspicion." *People v. Thingvold*, 145 Ill. 2d 441, 456 (1991). "[T]he State is not precluded from 'relitigating an issue when it is presented in a subsequent action governed by a lower standard of proof.' " *Jackson*, 149 Ill. 2d at 550 (quoting *Dowling v. United States*, 493 U.S. 342, 349 (1990)). In *Jackson*, our supreme court held that evidence of prior criminal conduct can be considered at sentencing even if defendant is acquitted of that conduct, because the burden of proof at sentencing is lower than proof beyond a reasonable doubt. *Id*. at 549-53. Similarly, defendant's earlier acquittal on the aggravated criminal sexual assault charge (alleging oral penetration) in the D.D. case under the "beyond a reasonable doubt" standard

of proof did not bar the subsequent admission, here, of the other-crimes evidence on that charge, where the admission of the other-crimes evidence was governed by the lower "more than a mere suspicion" standard of proof.

¶ 74  Next, defendant argues that even if section 115-7.3 did not *automatically* foreclose the admission of the other-crimes evidence, the trial court still should have denied its admission after weighing the relevant factors. Section 115-7.3 provides that the relevant factors the trial court should consider when deciding whether to admit other-crimes evidence include: "(1) the proximity in time [of the other offense] to the charged or predicate offense"; (2) "the degree of factual similarity to the charged or predicate offense"; or (3) "other relevant facts and circumstances." 725 ILCS 5/115-7.3(c) (West 2010). We review the trial court's admission of the other-crimes evidence for an abuse of discretion. *Ward*, 2011 IL 108690, ¶ 21.

¶ 75  At the hearing on the State's motion to admit the other-crimes evidence of defendant's aggravated criminal sexual assault against D.D., the trial court first noted that the assault against D.D. was alleged to have occurred only about six months prior to the alleged assault against E.W. The trial court found this was a relatively short gap in time that weighed in favor of the admission of the other-crimes evidence, noting that other-crimes evidence had been admitted in cases in which there had been far longer gaps between the crimes. See *People v. Donoho*, 204 Ill. 2d 159, 186 (2003) (affirming the admission of other-crimes evidence where there was a 12- to 15-year gap between crimes).

¶ 76  The trial court next found that the degree of factual similarity between the two offenses weighed in favor of the admission of the other-crimes evidence. The trial court noted that both offenses were predicated on defendant approaching a female in his automobile, at similar times at night on the south side of Chicago, and forcing them into the car at gunpoint and then robbing and sexually assaulting them. In addition, we note that both victims were African-American, and that defendant penetrated both of them orally and vaginally. This case is similar to *People v. Williams*, 2013 IL App (1st) 112583, in which the appellate court affirmed the admission of other-crimes evidence, where the similarities in the two offenses included: both victims were young African-Americans; they were both alone at night; the assaults occurred in close geographic proximity to each other; they both involved vaginal penetration; and the assailant held the victims down with his body weight. *Id*. ¶ 48. The appellate court found that the facts were sufficiently similar to support admissibility of the other crime under section 115-7.3. *Id*. The instant case is largely analogous to *Williams* in the similarity between defendant's assault on E.W. and his assault on D.D. As in *Williams*, the facts of the two cases are sufficiently similar to support the admissibility of the other-crimes evidence.

¶ 77  The trial court then considered the final factor, "other relevant facts and circumstances." 725 ILCS 5/115-7.3(c) (West 2010). In weighing this factor, the trial court addressed defendant's argument that the introduction of evidence of defendant's sexual assault of D.D. would cause a mini-trial because of the amount of time that the parties would spend presenting expert testimony regarding the DNA analysis of D.D.'s vaginal swabs. The trial court recognized that the danger of such a mini-trial is that the State's evidence of the other crime against D.D. could "overshadow some relative paucity or almost lack of evidence regarding the charged crime [such] that the jury would then find [defendant] guilty simply because they believed he did the *** other crime rather than the charged crime."

¶ 78 However, after considering the expert testimony that would likely be introduced with regard to defendant's assault against D.D., namely the testimony of the State's expert, Mr. Richert, and defendant's expert, Dr. Reich, the trial court concluded that it would not be so overwhelming as to result in a mini-trial prejudicial to defendant, and so granted the State's motion to admit the other-crimes evidence.

¶ 79 Given that the trial court engaged in a meaningful analysis of all three statutory factors that was in line with the established case law, we find no abuse of discretion in its admission of the other-crimes evidence of defendant's aggravated criminal sexual assault against D.D.

¶ 80 Defendant argues, though, that after the jury entered a partial acquittal in the D.D. case, it was "unfair" and "harassing" for the State to present the nearly "identical" E.W. case against him utilizing evidence from the D.D. case as other-crimes evidence, and that the harassing nature of the State's prosecution should have caused the trial court to bar the other-crimes evidence. We disagree. Defendant was separately charged with committing two entirely separate crimes: the sexual assault against D.D. in July 2002, and the unrelated sexual assault against E.W. approximately six months later in February 2003. After the D.D. case was taken to trial and a partial acquittal entered, the State properly brought the E.W. case to trial and sought the admission of the other-crimes evidence as it was allowed to do under section 115-7.3. There was nothing unfair or harassing in the State's prosecution of defendant for his alleged sexual assaults of D.D. and E.W., nor was there anything unfair or harassing in the State's utilization of section 115-7.3 to seek the admission of other-crimes evidence. As discussed earlier in this opinion, the trial court committed no abuse of discretion in admitting the other-crimes evidence.

¶ 81 Defendant next argues that the trial court erred in crediting the testimony of the State's expert, Mr. Richert, over the testimony of the defense expert, Dr. Reich, with regard to the DNA analysis of D.D.'s vaginal swabs and finding that the other-crimes evidence of defendant's sexual assault on D.D. established defendant's propensity to commit sex crimes. Defendant argues that the trial court should have made the opposite finding, *i.e.*, that Dr. Reich was more credible than Mr. Richert, and then excluded the other-crimes evidence. We disagree. See *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009) ("in a bench trial, it is for the trial judge, sitting as the trier of fact, to determine the credibility of witnesses, to weigh evidence and draw reasonable inferences therefrom, and to resolve any conflicts in the evidence").

¶ 82 For the foregoing reasons, we affirm the circuit court.

¶ 83 Affirmed.