2019 IL App (2d) 170163-U
No. 2-17-0163
Order filed November 6, 2019

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of McHenry County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 15-CF-93 |
| JAMES F. LINDER, | ) ) | Honorable Sharon L. Prather, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE BRIDGES delivered the judgment of the court.
Justices McLaren and Jorgensen concurred in the judgment.

**ORDER**

¶ 1   *Held*:   Defendant's counsel was not ineffective for not objecting at trial to the other-crimes evidence presented or to the jury instruction on this issue. Further, a rational trier of fact could have found defendant guilty beyond a reasonable doubt of delivering one gram or more of heroin. Therefore, we affirmed.

¶ 2   Following a jury trial, defendant, James F. Linder, was convicted of drug induced homicide (720 ILCS 5/9-3.3 (West 2014)) and sentenced to 28 years' imprisonment. On appeal, he argues that: (1) his counsel was ineffective for failing to object to the introduction of excessive and highly prejudicial other-crimes evidence, and (2) the State failed to prove beyond a reasonable doubt that he delivered more than one gram of heroin. We affirm.

¶ 3                                I. BACKGROUND

¶ 4    On February 19, 2015, a grand jury indicted defendant on one count of drug induced homicide. As later amended, the indictment alleged that on January 30, 2015, defendant knowingly delivered one gram or more of heroin to Cody Hillier, who knowingly delivered it to Danielle Barzyk, who thereafter inhaled a portion of the heroin, causing her death.

¶ 5    Defendant filed a motion to dismiss for lack of proper venue, arguing that the alleged delivery occurred in Lake County rather than McHenry County. The trial court denied the motion on October 22, 2015, stating that venue was proper in any county where any element of the offense was committed, which included McHenry County because that was where Barzyk allegedly ingested the heroin. Defendant thereafter filed a motion for a change in venue, which the trial court also denied.

¶ 6    Prior to trial, the State filed various motions *in limine*, including a motion to admit evidence of a subsequent narcotics transaction on January 31, 2015, for the purpose of proving identity. The State also filed a motion *in limine* to admit evidence that, through threats and intimidation, defendant and another inmate coerced Hillier into writing a letter stating that defendant was not the person who sold him heroin on January 30, 2015. The State argued that the evidence was relevant to show consciousness of guilt. The trial court allowed these motions over defendant's objection, ruling that the probative value of the evidence was not outweighed by undue prejudice. It stated that it would give the jury a limiting instruction stating that the evidence was admitted for the sole purposes of establishing identity for the first motion and consciousness of guilt for the second motion.

¶ 7                                    A. Trial

¶ 8    Testimony in defendant's trial began on January 10, 2017. Cody Hillier testified as follows. He was 25 years old. He met his girlfriend, Danielle Barzyk, in the summer of 2014, while they both were in treatment for heroin addiction. They completed the treatment program, but they relapsed in mid-November 2014.

¶ 9    On January 30, 2015, Hillier and Barzyk decided to buy heroin from a dealer Hillier had used two or three times before, whom he knew as "Tim." Hillier contacted "Tim" and arranged to buy heroin. Hillier and Barzyk drove to a home near 29th and Ezra in Zion around noon. Hillier went inside and purchased three half-gram bags of heroin from "Tim" for $180. In court, Hillier identified defendant as "Tim."

¶ 10    Hillier and Barzyk then drove to Deerfield because Barzyk had a job interview there. Hillier snorted some of the heroin, and Barzyk snorted some of the heroin after her interview. They then drove to Algonquin and went to their separate residences around 5 or 6 p.m. Hillier injected heroin, and he believed that Barzyk also used heroin at her house. At about 7 or 7:30 p.m., Hillier picked up Barzyk from her house, and they went back to Hillier's rented room. During the evening, they got takeout food, watched movies, had sex, went to a bar, and snorted more of the heroin purchased from defendant.

¶ 11    Barzyk drank only water at the bar because she had not been feeling well "most of the day." She was having trouble breathing and was constantly using her inhaler. Around midnight, her inhaler ran out, and she could not breathe well. Barzyk asked Hillier if the Algonquin police station was open 24 hours. Hillier drove her the five blocks to the station because he did not know where a hospital was located. Hillier parked in back and ran around to the front of the building. He used a phone in the vestibule that connected to 911 and reported that Barzyk was having an asthma attack. He ran back to the car and saw Barzyk lying on the ground, gasping for air. Hillier began

performing chest compressions, and the police arrived within minutes and took over. Hillier initially did not disclose their heroin use because he did not want them to get in trouble. However, he later told a police officer that Barzyk had taken prescription "Narco." Hillier explained at trial that "Narco" also contains opiates, so the treatment for an overdose would be the same.

¶ 12    An ambulance took Barzyk to the hospital, and the police took Hillier into custody. He consented to a search of his car and the room he was renting. Hillier had put the remaining heroin in two contact lens cases underneath his mattress. One of the cases had a blue lid, and the other had a green lid. Hillier identified photographs of the contact lens cases and drug paraphernalia that police recovered from his room.

¶ 13    At about 3 a.m., the police informed Hillier that Barzyk had passed away. Hillier was later interviewed by police officers with the North Central Narcotics Task Force, and he agreed to make a controlled heroin purchase from defendant while wearing a recording device. Hillier called defendant from his cell phone on January 31, 2015, with officers recording the conversation. He arranged to meet defendant at the Walmart in Zion that day and buy three half-gram bags of heroin.

¶ 14    Police officers gave Hillier $180 in recorded bills. Hillier stood outside the store, and defendant pulled up in a black Pontiac Grand Prix. He told Hillier to get in the car, but Hillier told him to park. Hillier then walked over to the car. Hillier handed defendant the $180, and defendant gave him three bags of heroin. Hillier walked back to the front of the store, where Officer Timothy Cooney picked him up.

¶ 15    Hillier was charged with unlawful possession of a controlled substance and unlawful delivery of a controlled substance to Barzyk. He was held in jail from January 31, 2015, to July 5, 2016. Hillier pleaded guilty and was sentenced to probation. However, Hillier was currently again

in jail because he had relapsed, and a petition to revoke his probation was pending. The State had not promised him anything for his guilty plea or his courtroom testimony.

¶ 16    Hillier sent a notarized letter dated December 19, 2016, to defendant's attorney stating that defendant was not the person who sold him the heroin that Barzyk ingested before dying. In the letter, Hillier stated that the police forced him to do the controlled buy, and that after seeing defendant's face, Hillier realized that he was the wrong person. The letter continued that Hillier did not know who defendant was and had never seen him before, and that at the time Hillier made his statement to the police, he was under the influence of drugs and alcohol and under great duress due to Barzyk's death.

¶ 17    At trial, Hillier testified that after leaving the medical wing of the jail, he was approached by Cordelle Miller, who identified himself as defendant's cousin. Miller told Hillier to talk to defendant through a vent that connected to defendant's section of the jail. Hillier and defendant had three conversations through the vent in which defendant asked Hillier to write a letter stating that defendant was innocent. Defendant said that if Hillier wrote the letter, no harm would come to Hillier or his family, and that he and Miller would put $500 to $1000 in Hillier's commissary account. Defendant had repeatedly threatened Hillier, and in the days that followed, defendant and Miller kept asking if Hillier wrote the letter. Hillier therefore wrote the letter, though he never received the money that was promised.

¶ 18    Hillier subsequently met with his lawyer and told him about the threats and the letter. Hillier later contacted the jail and asked to be placed in "protective custody." The statements in the letter were not true. Rather, defendant sold him the heroin that he purchased on January 30, 2015, and that was the only heroin Hillier and Barzyk used that day.

¶ 19    The State presented evidence that the weight of the substance in the blue contact lens case was 0.1 gram, and the weight of the substance in the green contact lens case was less than 0.1 gram. The substance in the blue case tested positive for heroin. The substance in the green case was not tested because it had the same appearance.

¶ 20    Algonquin police Sergeant Robert Sowizrol testified that he responded to Hillier's 911 call. Barzyk was lying on the ground, had a bluish tint to her face, and did not appear to be breathing. Hillier first told the police that Barzyk was having an asthma attack but later said she had consumed 10 to 12 Vicodin pills or 10 Hydrocodone pills.

¶ 21    A paramedic testified that it did not appear that Barzyk was suffering from an asthma attack, because she was vomiting. After the paramedic heard from Hillier that she had taken "Norcos," they gave Barzyk two rounds of Narcan, which is a drug that can reverse the effects of an opiate. However, Barzyk was "past the point of no return" because she had "so much vomit in her lungs," and the Narcan was not effective. A hospital nurse testified that Barzyk was brought in around 2:09 a.m. in very grave condition, with no heartbeat. She was pronounced dead at 2:22 a.m. A forensic toxicologist testified that Barzyk's blood contained a low level of cocaine metabolites, signifying use about 24 to 30 hours prior. It also contained diacetylmorphine, codeine, and 6-monacetylmorphine, which together indicated heroin use. The levels were quite high, indicating use within a couple of hours of death. Death from opiates, like heroin, was primarily due to the drugs suppressing breathing, causing people to suffocate. The toxicologist could not say what caused Barzyk's death, but the levels of the non-heroin compounds would not have been lethal to her. If a person had asthma problems, heroin could exacerbate the respiratory effect.

¶ 22    Dr. Mitra Kalelkar, a forensic pathologist, testified that she conducted an autopsy on Barzyk. Barzyk's lungs had a lot of fluid, which was common with overdose deaths, as well as

drowning deaths. Dr. Kalelkar did not microscopically examine the lung tissue. Blood tests revealed the presence of morphine, codeine, and 6-monacetylmorphine, which led Dr. Kalelkar to conclude that Barzyk died of heroin intoxication. She included cocaine as a cause of death because it was "a substance that should not [have been] in her system at all," but heroin was the primary cause of her death. Dr. Kalelkar was aware that Hillier reported that Barzyk was having an asthma attack, but this did not change her conclusion about the cause of Barzyk's death.

¶ 23    Forensic pathologist Hillary McElligott testified as an expert witness for the defense. She reviewed the fire department report, medical records, the autopsy and investigation reports, the microscopic slides prepared from autopsy tissue, and the postmortem toxicology report. She further prepared microscopic slides from tissue specimens from each organ and viewed them under a microscope. She agreed with Dr. Kalelkar that the primary cause of death was heroin and cocaine intoxication. However, her examination of the slide of lung tissue showed evidence of a significant acute asthma attack at the time of death. Thus, Barzyk's primary cause of death was "opiate and cocaine intoxication, specifically heroin," and "a major contributing factor [was] bronchial asthma."

¶ 24    Officer Timothy Wilkin testified that he interviewed Hillier at approximately 3:49 a.m. on January 31, 2015. Hillier admitted that he and Barzyk had used heroin. He said that they had purchased it around noon the previous day from "Tim," whom he described as being about 28 years old, at a house in Zion. Hillier said that he had paid $40 for the drugs.

¶ 25    Officer Timothy Cooney testified that he was present when Hillier arranged to purchase additional heroin from defendant. Hillier dialed a number that was stored in his phone under the name "Tim." The call was on speaker phone, and the police recorded the conversation. Hillier asked to buy heroin similar to what he had bought the previous day. The other person said that he

did not have the same stuff, but he had a darker substance. In a second phone call a few minutes later, they arranged to meet in the Walmart parking lot in Zion at about 7 p.m. Officers searched Hillier for currency and drugs, and then gave him $180 in recorded bills.

¶ 26    Hillier called "Tim" again and confirmed the meeting time and location, and said that he would be standing in front of the Walmart. Hillier called again when he arrived there. Cooney observed a black Pontiac drive slowly through the lot, past Hillier, and then park. At that point, it was out of Cooney's view for one or two minutes, at which time other officers still had visual contact. Hillier then walked back to the front of the Walmart, and Cooney picked him up.

¶ 27    Sergeant Jeff File testified that he sat in an unmarked vehicle in the Walmart parking lot and observed a black Pontiac drive past the front entrance where Hillier was standing and then park. Hillier walked over and spoke to the driver through the window, and there were hand movements. Afterwards, Hillier walked back toward the front of the Walmart, and the Pontiac left the parking lot. File took note of the Pontiac's license plate, which was registered to defendant at a location consistent with where Hillier described purchasing the heroin the previous day.

¶ 28    Special Agent Raymond O'Brien testified that he also observed the controlled buy from a vehicle in the Walmart parking lot. He saw a hand-to-hand transaction, which, based on his training and experience, appeared to be a narcotics transaction. O'Brien identified photographs that he took of defendant's residence, which was located where Hillier had described making the January 30, 2015, drug purchase.

¶ 29    Officer Brandon Bernabei testified that he conducted a traffic stop of defendant's vehicle after being given information by officers conducting surveillance, which included the license plate number. Defendant was the only occupant of the vehicle, and he was placed under arrest.

Defendant had $180 in his right front pocket, $52 in his left front pocket, and $1500 in his wallet. Defendant also had a cell phone in his sweatshirt pocket.

¶ 30    Cooney testified that the $180 found on defendant matched the serial numbers of the prerecorded bills. The police obtained a search warrant for defendant's phone, and it contained text messages to Hillier, including from text message conversations that Cooney had witnessed from Hillier's phone. Photographs of the text messages were admitted into evidence and published to the jury. Text messages were exchanged on January 30 and January 31, 2015. The police additionally obtained records through Sprint to compare the times of the text messages and calls on defendant's phone. The records showed the subscriber of the phone to be defendant. Text messages from Hillier to defendant on January 30, 2015, showed that defendant texted Hiller, "Just got new sh*t hit me up." Hillier texted that he was going to be in Zion around noon and wanted "2 halfs [*sic*]." Hillier then texted that he was on his way, and he asked, "You do three halfs [*sic*] for 160?" Defendant responded, "Yo?" There was a record of a subsequent 57-second phone call between the two. Hillier next texted defendant, "3 separate halfs [*sic*]. I don't want my girl to know I'm getting the third one." Defendant replied, "K." Following these texts, there were two phone calls lasting about one minute each.

¶ 31    The recorded phone calls between Hillier and defendant from January 31, 2015, and the recording obtained from the device worn by Hillier during the controlled drug buy were played for the jury.

¶ 32    The State presented evidence that the three bags Hillier obtained from defendant during the controlled buy each contained heroin. The total gross weight of the packaging and the heroin was 1.517 grams. The total weight of just the heroin, after subtracting the weight of the bags, was

"1.036" grams. The forensic drug chemist opined that the exhibit "contained 1.3[1] grams of chunky substance from three different packages that did contain heroin."

¶ 33    Sergeant Michael Muraski was accepted as an expert in street level narcotics distribution and testified that the average price of heroin in McHenry and Lake Counties was about $100 per gram. He expected that a person would receive at least 1.5 grams of heroin for $160 to $180. A person asking for "three halves" would be requesting 1.5 grams of heroin.

¶ 34    Cordelle Miller was granted use immunity and provided the following testimony. He was currently in jail on armed robbery and domestic battery charges, and had several prior convictions. Miller did not know defendant well but knew defendant's brother. Miller and Hillier were housed in the same section of the jail together. Hillier told Miller that defendant was innocent and asked how he could help defendant. Miller denied that he told Hillier to talk to defendant through the vent. He observed them talking through the vent several times, but he did not stay and listen to the conversations. Miller saw defendant at church in the jail, and defendant gave Miller his attorney's information to pass on to Hillier. At one point, defendant gave Miller the phone numbers of mutual acquaintances, including one of Miller's older cousins. The cousin said that after Miller "took care of the situation," he would put together a "starter kit" for Miller. Miller provided his cousin with his inmate number and address, and the cousin said that he would send something to Miller within a week. Hillier showed Miller the letter he was going to send to defendant's attorney.

¶ 35    Detective Mike Quick testified that on December 23, 2016, he was assigned to investigate a case involving potential harassment of a witness. He interviewed Hillier and Miller. During the interview, Miller said that: defendant told him to give Hillier a piece of paper to "write what he

---

[1] We discuss the discrepancy in weight later in the disposition.

was supposed to write"; Hillier may have felt threatened by the way Miller carried and presented himself; Hillier may have thought that Miller was "muscle" for defendant; and both he and Hillier had conversations with defendant through the vent.

¶ 36   The trial court conducted "an informal jury instruction conference" off the record. The next day, it ruled on each jury instruction on the record. Defense counsel stated that he had no objection to the other-crimes evidence instruction because it had been amended from its original form.

¶ 37   The jury found defendant guilty of drug induced homicide, with defendant having delivered one gram or more of a controlled substance.

¶ 38   Defendant filed a motion for a new trial on February 3, 2017. He filed an amended motion for a new trial on February 22, 2017, arguing, among other things, that the trial court erred in granting the State's motions *in limine* seeking to admit other-crimes evidence, and that the State failed to prove that the weight of the substance that he allegedly delivered exceeded one gram. The trial court denied the motion on February 24, 2017, and then proceeded to the sentencing hearing. It sentenced defendant to 28 years' imprisonment, followed by three years of mandatory supervised release. Defendant timely appealed.

¶ 39                                    II. ANALYSIS

¶ 40                            A. Other-Crimes Evidence

¶ 41   Defendant first argues that he was denied a fair trial due to the presentation of an excessive amount of highly prejudicial other-crimes evidence regarding the uncharged drug transaction arranged by the police the day after the instant offense. Pursuant to the State's motion *in limine*, the trial court ruled that the evidence was admissible to show the identity of the person who delivered heroin to Hillier.

¶ 42    Other-crimes evidence is not admissible to show a defendant's propensity to commit crime, because a jury might convict the defendant on the basis that he deserves to be punished, as opposed to the strength of the evidence of the crime charged. *People v. Rosado*, 2017 IL App (1st) 143741, ¶ 22. However, under common law, evidence of other crimes is admissible if it is relevant for any purpose other than to show a defendant's propensity to commit crimes. *People v. Chapman*, 2012 IL 111896, ¶ 19. Such purposes include, among others, motive, intent, identity, lack of mistake, and *modus operandi*. *Id.* These principles are codified in Illinois Rule of Evidence 404(b) (eff. Jan. 1, 2011), which states, "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith except as provided by [certain statutes]. Such evidence may also be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Even when evidence is offered for a permissible purpose, it will be excluded if its prejudicial impact substantially outweighs its probative value. *Chapman*, 2012 IL 111896, ¶ 19. Subsequent bad acts can be used as other-crimes evidence. *People v. Johnson*, 2014 IL App (2d) 121004, ¶ 46. We review the decision of whether to admit other-crimes evidence for an abuse of discretion. *People v. Peterson*, 2017 IL 120331, ¶ 125. This standard is highly deferential, and we will not reverse the trial court's ruling unless it is arbitrary, fanciful, or if no reasonable person would agree with it. *Id.* The erroneous admission of other-crimes evidence creates a high risk of prejudice that generally requires a reversal, but the erroneously-admitted evidence must have been a material factor in the defendant's conviction, such that the verdict likely would have been different absent the erroneously-admitted evidence. *People v. Foreman*, 2019 IL App (3d) 160334, ¶ 31.

¶ 43 Defendant acknowledges that his trial counsel did not object at trial to the other-crimes evidence, but he argues that counsel was ineffective in failing to do so. For a claim of ineffective assistance of counsel, a defendant must satisfy the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Hodges*, 234 Ill. 2d 1, 17 (2009). The defendant must first establish that, despite the strong presumption that trial counsel acted competently and that the challenged action was the product of sound trial strategy, counsel's representation fell below an objective standard of reasonableness under prevailing professional norms such that he or she was not functioning as the counsel guaranteed by the sixth amendment. *People v. Manning*, 227 Ill. 2d 403, 416 (2008). Second, the defendant must establish prejudice by showing a reasonable probability that the proceeding would have resulted differently absent counsel's errors. *People v. Valdez*, 2016 IL 119860, ¶ 14. A failure to establish either prong of the *Strickland* test precludes a finding of ineffectiveness. *People v. Peterson*, 2017 IL 120331, ¶ 79.

¶ 44 Defendant's argument also involves the instruction given to the jury on other-crimes evidence. We will not reverse a trial court's decision on which jury instructions to give unless the trial court abused its discretion. *People v. Choate*, 2018 IL App (5th) 150087, ¶ 23. However, we review *de novo* whether a jury instruction correctly conveyed the applicable law. *People v. Messenger*, 2015 IL App (3d) 130581, ¶ 38.

¶ 45 Defendant asserts that he is not disputing that a limited amount of other-crimes evidence could be introduced on the question of identity, but he argues that the State presented an exceptionally large amount of evidence regarding the January 31 controlled buy, which greatly exceeded the evidence needed to establish the identity of the person who delivered heroin to Hillier on January 30. Defendant cites *People v. Richardson*, 123 Ill. 2d 322, 341 (1988), where the court stated that when evidence of another crime is admitted for the question of identity, it should be

limited to the details showing the opportunity for identification, and not the details of the crime. The court further stated that such evidence is not admissible just to show how the investigation unfolded and how the defendant came into custody. *Id.* at 342. Defendant argues that in addition to exceeding the scope of other-crimes evidence relevant to the issue of identity, the sheer cumulative effect created a mini-trial within the trial. Defendant cites *People v. Boyd*, 366 Ill. App. 3d 84, 94 (2006), where the court stated that the other-crimes evidence must not become the focal point of the trial, and that a trial within a trial can be avoided by limiting the details of the other crime to what is necessary for illustrating the reason the evidence was introduced.

¶ 46     Defendant argues that other-crimes evidence was excessive, cumulative, and prejudicial, in that Hillier and four police witnesses testified about the January 31, 2015, controlled buy. Defendant argues that, in particular, O'Brien's entire testimony was not relevant to the identity of the person who sold heroin to Hillier, but rather he explained at length to the jury the mechanics of exchanging contraband for cash. Defendant also notes that O'Brien testified that the police had identified the dealer as defendant before the controlled buy took place. Defendant further points out that two officers testified that he had $1,500 in his wallet at the time he was arrested, and defendant argues that this fact had no probative value on the issue of identity, but was highly prejudicial because it inferred that he was a large-scale drug dealer. According to defendant, the jury heard more evidence regarding the January 31 narcotics transaction than about the January 30 transaction that was the basis for the charged offense.

¶ 47     Defendant asserts that the error injected into his trial by the presentation of overly broad and cumulative other-crimes evidence was compounded by the jury instruction regarding the use of the evidence. The jury in defendant's trial was instructed as follows:

"Evidence has been received that the defendant has been involved in offenses other than that charged in the indictment.

This evidence has been received on the issues of the defendant's identification, method of sale on January 30, 2015, weight of the substance on January 30, 2015 and consciousness of guilt and may be considered by you only for that limited purpose.

It is for you to determine whether the defendant was involved in those offenses and, if so, what weight should be given to this evidence on the issues of identification, method of sale on January 30, 2015, weight of substance on January 30, 2015 and consciousness of guilt."

¶ 48    Citing Illinois Rule of Evidence 404(b), defendant argues that neither the "method of sale" nor "weight of the substance" are proper uses of other-crimes evidence. Defendant maintains that the instruction therefore improperly authorized the other-crimes evidence to be used as propensity evidence against him. Defendant also cites *People v. Davis*, 248 Ill. App. 3d 886, 896 (1993), where the appellate court held that the trial court erred in instructing the jury that the other-crimes evidence could be considered on the issue of a common plan or system of operation, because the evidence of drug transactions admitted did not show a larger criminal scheme of which the charged crime was just one part. The appellate court did not reverse, however, stating that the other-crimes evidence was clearly admissible, and although the reference to common design and system of operation may have been confusing, it did not prejudice the defendant. *Id.*

¶ 49    Defendant asserts that his counsel's representation was unreasonable where he failed to object to the overly broad and cumulative evidence of other crimes, and that defendant suffered prejudice because it is entirely plausible that, as a result, the jury convicted him because it believed he was a bad person who deserved punishment. Defendant similarly argues that counsel's

representation was unreasonable for failing to object to the other-crimes evidence jury instruction, and that defendant was prejudiced as a result because the jury was improperly instructed that it could consider the other-crimes evidence for the "method of sale" and the "weight of substance" for the January 30, 2015, transaction.

¶ 50    The State responds that the record shows that it did not exceed the scope of the other-crimes evidence, in that out of 23 State witnesses, only five people testified to the events concerning defendant's delivery of heroin on January 31, 2015. The State further argues that the trial occurred over a four-day period, and the five witnesses testified for a limited amount of time on the second day. According to the State, given this context, the overwhelming majority of the evidence it presented concerned the January 30 drug transaction. The State argues that evidence of the controlled purchase played an important role in establishing defendant's identity, which was a central issue in the case. The State notes that although Hillier identified defendant as the person he knew as "Tim" and had purchased drugs from him on January 30, Hillier also wrote a letter stating that defendant was not the man he had purchased drugs from that day. Hillier further admitted at trial that he had lied at various times, including in court. The State argues that since Hillier's credibility was undermined at trial, the other-crimes evidence was necessary to prove that defendant was the person who sold and delivered the heroin to Hillier. The State maintains that the controlled purchase of heroin led to defendant's arrest, which in turn resulted in the discovery of text messages between defendant and Hillier, which showed that Hillier had inquired about purchasing heroin from "Tim" on January 30. Phone records later confirmed that the individual referred to as "Tim" communicated with Hillier from a phone number registered in defendant's name. The State argues that the other-crimes evidence therefore led to information confirming the identity of "Tim" as defendant, and laid the foundation for the admission of the text messages.

¶ 51    The State continues that defendant's counsel was not ineffective on this issue, in that when the State filed its motions *in limine*, defense counsel objected to the use of other crimes evidence. The State argues that in addition to opposing the admission of other-crimes evidence during pre-trial proceedings, defense counsel cross-examined the State's witnesses and filed an amended motion for a new trial preserving the issue of other-crimes evidence for review. The State argues that even if defense counsel's performance were deficient, defendant was not prejudiced, as evidence of the controlled purchase was proper for the purpose of establishing defendant's identity.

¶ 52    On the subject of the jury instruction, the State highlights that the parties and the trial court discussed the instructions in a conference off the record. The State argues that we therefore do not know what objections counsel raised to the instruction, and any doubts arising from the incompleteness of the record must be resolved against defendant. See *Foutch v. O'Bryant*, 99 Ill. 2d 389, 392 (1984). The State further argues that evidence of the controlled purchase could be considered for "method of sale" because it was evidence of defendant's plan to deliver heroin to Hillier. The State contends that the plan was extremely similar during both drug transactions, including the use of the pseudonym "Tim," text messages, and cell phone conversations concerning the purchase of heroin in Zion. The State argues that the jury was also properly instructed that it could consider the other-crimes evidence for "weight of substance," because "it showed that defendant knew that he was delivering approximately 1.5 grams of heroin to Hillier."

¶ 53    The State argues even if the trial court erred in allowing the jury instruction, the error does not amount to reversible error. The State cites *People v. Johnson*, 2014 IL App (2d) 121004, ¶ 51, where this court stated, "evidence [of other crimes] admissible for one purpose is not affected by inadmissibility for another." See also *People v. Spyres*, 359 Ill. App. 3d 1108, 1115 (2005) (when the jury receives a limiting instruction allowing it to consider evidence for a number of reasons,

one of which is later determined on appeal to be improper, the conviction must be affirmed despite the overly-broad instruction).

¶ 54    We begin with the issue of the jury instruction. Although the trial court initially granted the State's motion *in limine* to allow other-crimes evidence to establish identity, a trial court's ruling on a motion *in limine* is an interlocutory order that is always subject to reconsideration during trial. *People v. Jophlin*, 2018 IL App (4th) 150803, ¶ 73. Therefore, the trial court could amend its ruling to allow the other-crimes evidence to be considered for additional purposes, which must have been discussed in the jury instructions conference that occurred off the record. Defendant takes the position that Rule of Evidence 404(b) contains an exclusive list for what purposes other-crimes evidence may be admitted, but the rule states that the evidence "may also be admissible for other purposes, such as ***" (Ill. R. Evid. 401 (eff. Jan. 1, 2011)), meaning that it is not an exclusive list. As stated, evidence of other crimes is admissible if it is relevant for *any purpose* other than to show a defendant's propensity to commit crimes. *Chapman*, 2012 IL 111896, ¶ 19.

¶ 55    Accordingly, it was not an abuse of discretion for the trial court to admit the other-crimes evidence to show "method of sale" and "weight of the substance" on January 30, 2015, in that the evidence was relevant to these issues. See Ill. R. Evid. 404(b) (eff. Jan. 1, 2011) (evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."). That is, as the State discusses, the other-crimes evidence was relevant to the method of sale because in both the January 30 and January 31 transactions, Hillier contacted the person he knew as "Tim" through his cell phone using "Tim's" cell phone number, and arranged via calls and text messages to buy heroin from "Tim" in Zion. The other-crimes evidence was relevant to

the "weight of the substance" because in both situations, Hillier asked to buy three half-gram bags of heroin and paid $180. See also *People v. Watkins*, 2015 IL App (3d) 120882, ¶¶ 46-47 ("Illinois courts have routinely allowed evidence of a defendant's prior or subsequent drug transactions to be admitted into evidence at trial to establish a defendant's intent to deliver the drug for which the defendant is currently charged or for any other relevant and permissible purpose," and only a threshold similarity between the other-crimes evidence and the current offense is required). We address the sufficiency of the evidence as to the weight of the drugs later in this disposition.

¶ 56        Furthermore, even if, *arguendo*, the other-crimes evidence should not have been admitted for these purposes, defendant does not dispute that it was admissible to show identity. As the State points out, this court stated in *Johnson* that because the trial court properly instructed the jury that it could consider other-crimes evidence for propensity and intent, its instruction that the jury could also consider the evidence for three improper reasons was not a basis for reversal. *Johnson*, 2014 IL App (2d) 121004, ¶ 52; see also *People v. Mendez*, 2013 IL App (4th) 110107, ¶ 35 ("even when other-crimes evidence is not admissible pursuant to certain exceptions, the inclusion in a jury instruction of the proper exception warrants affirming the defendant's conviction"). As such, because it is undisputed that the jury instruction contained a proper basis to consider the other-crimes evidence, it would not be reversible error for the instruction to additionally contain improper bases. Defendant therefore cannot satisfy either prong of the *Strickland* test as to the jury instruction, in that he cannot show that counsel was unreasonable in failing to object to the instruction, and he cannot show that he was prejudiced by the jury receiving the instruction.

¶ 57        We also disagree with defendant that the State presented an excessive amount of other-crimes evidence that was cumulative, resulting in a mini-trial. It is logical that the State presented limited evidence of the actual January 30, 2015, heroin transaction, as defendant was the only

testifying witness who was present at the transaction. In contrast, numerous police officers were involved in setting up and executing the January 31, 2015, controlled buy. The State could not simply present the testimony of one or two of the officers, as none of the officers were present for the entire transaction and arrest.

¶ 58    For example, Cooney testified regarding setting up the heroin purchase, seeing a Pontiac in the Walmart parking lot, matching the prerecorded bills to the ones found on defendant, and about phone records from defendant's phone. However, Cooney did not see Hillier purchasing the drugs from defendant, nor was he present for defendant's arrest. In contrast, File testified about seeing a hand-to-hand transaction, and he also obtained the Pontiac's license plate number and found that it was registered to defendant. O'Brien also viewed the hand-to-hand transaction and described how, based on his training and experience, it appeared to be a narcotics transaction, which was important because the police did not directly see Hillier give cash to defendant and receive drugs in exchange. O'Brien further identified photographs of defendant's residence, the location of which was consistent with where Hillier described purchasing drugs from defendant on January 30, 2015. Bernabei testified that he conducted the traffic stop of defendant's vehicle and found $180 in one pocket and a cell phone on defendant's person. Defendant takes issue with Bernabei additionally testifying that defendant had $1,500 in his wallet, but large amounts of cash is circumstantial evidence of drug dealing (see *People v. Robinson*, 167 Ill. 2d 397, 411-12 (1995)), and the State was trying to prove that defendant sold heroin to Hillier the previous day. For these reasons, the evidence that the State presented regarding other-crimes was not excessive. Further, it consumed just a portion of the days-long trial and did not become a mini-trial. Correspondingly, defendant has failed to show that his counsel acted unreasonably in failing to object to the amount of other-crimes evidence at trial, or that defendant suffered prejudice as a result.

¶ 59                              B. Sufficiency of the Evidence

¶ 60    Defendant next argues that the State failed to prove beyond a reasonable doubt that the weight of the heroin delivered on January 30, 2015, exceeded one gram. Defendant highlights that drug-induced homicide is typically a class X felony (720 ILCS 5/9-3.3(b) (West 2014)) which carries a sentence of 6 to 30 years (730 ILCS 5/5-4.5-25 (West 2014)). However, if a person delivers, among other things, one gram or more of heroin (720 ILCS 570/401(c)(1) (West 2014)), the sentencing range is 15 to 30 years (720 ILCS 5/9-3.3(c) (West 2014)). Here, the State charged defendant with delivering one gram or more of heroin. The jury was given various verdict forms which required it to determine whether the State had proven that defendant had delivered one or more grams of a controlled substance, and the jury found in the State's favor on this question. However, if the State did not provide sufficient evidence of the weight of the drugs, defendant would be subject to a sentencing range with a significantly lower minimum sentence of 6 years rather than 15 years.

¶ 61    Defendant emphasizes that there was no direct evidence of the actual weight of the narcotics delivered to Hillier on January 30. Defendant argues that although Hillier testified that he purchased three half-gram bags of heroin, there was no evidence what the substance weighed before Hillier bought it or before Hillier and Barzyk consumed the drugs. Defendant notes that when the police seized the unused portion of the purchase, it weighed less than 0.2 grams.

¶ 62    Regarding the heroin sold on January 31, defendant again asserts that the jury should not have been instructed that it could consider that evidence when determining the weight of the heroin sold on January 30. Defendant cites *People v. Young*, 2013 IL App (2d) 120167, ¶ 28, where this court held that it was error for an other-crimes instruction to state that the jury could consider the

other-crimes evidence to determine "possession" of drugs, because the defendant was charged with "possession," so the instruction implied that the evidence could show propensity.

¶ 63    Defendant additionally argues that the jury could not find, as a matter of law, that the weight of the heroin sold on January 30 exceeded one gram by considering that the three packets seized on January 31 contained 1.036 grams of heroin. He argues that Illinois courts recognize that controlled substances in powder form are not homogeneous and, therefore, finders of fact cannot presume similarities in weight and composition of different packages, even though they may appear similar. See *People v. Fountain*, 2011 IL App (1st) 083459, ¶ 14 ("the trier of fact may not infer beyond a reasonable doubt that the powdered substance present in the weighed but untested packets is identical to the substance of the tested packets because powder is not homogenous").

¶ 64    Defendant cites *People v. Jones*, 174 Ill. 2d 427 (1996). There, the defendant was arrested for possessing five separate packets that contained a white rocky substance. *Id.* at 428. The State tested the substance in two of the five packets, weighing a total of 0.59 grams, but did not test the substance in all of the packets, which in total weighed 1.4 grams. *Id.* The defendant was convicted of possession with intent to deliver 1.4 grams of cocaine. *Id.* Our supreme court stated that "random testing is permissible when the seized samples are sufficiently homogenous so that one may infer beyond a reasonable doubt that the untested samples contain the same substance as those that are conclusively tested." *Id.* at 429. In contrast, if samples were not sufficiently homogenous, a portion from each container or sample had to be tested. *Id.* at 429. The supreme court held that the five packets containing loose substances could not be equated to identically marked and stamped tablets, pills, or capsules, so samples from each packet would have had to have been tested to prove beyond a reasonable doubt that the defendant possessed one gram or more of cocaine. *Id.* at 430.

¶ 65    Defendant argues that, as in *Jones*, the jury could not infer that the weight or composition of the contents of the packets purchased on January 30 by considering the weight of the substances delivered to Hillier the following day, especially given that defendant told Hillier that he no longer had the same drugs. Defendant maintains that the weight of the heroin purchased on January 31, being 1.036 grams, is so close to the one-gram threshold that no rational trier of fact could find, beyond a reasonable doubt, that the weight of similarly-packaged substances from another day also exceeded one gram.

¶ 66    The State responds that *Young* is distinguishable because it was reviewed under plain error, which defendant did not raise here. The State also again cites *Johnson*, 2014 IL App (2d) 121004, ¶ 52, for the proposition that even if a jury instruction contains improper issues, it is not a ground for reversal. The State further argues that even without the use of other-crimes evidence, it proved beyond a reasonable doubt that defendant delivered one gram or more of a substance containing heroin. The State points to Hillier's testimony that he gave defendant $180 in exchange for "three half gram bags" of heroin, as well as Muraski's expert testimony that the average street price for one gram of heroin was about $100, and that $160 to $180 would have purchased "at least a gram and a half" of heroin. The State contends that, therefore, even though Hillier did not personally weigh the heroin, it could be inferred that he actually purchased over one gram given the street value of heroin, as testified to by Muraski. The State notes that circumstantial evidence is sufficient to sustain a conviction. See *People v. Stone*, 46 Ill. App. 3d 729, 731 (1977). The State cites *People v. Trotter*, 293 Ill. App. 3d 617, 619 (1997), where the appellate court held that a police officer's testimony that the defendant sold him cocaine for $20 was sufficient evidence to sustain the defendant's conviction for delivery of a controlled substance, even though the defendant was not carrying any drugs or money on his person when he was arrested.

¶ 67    When examining the sufficiency of the evidence, we must determine whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *People v. Collins*, 106 Ill. 2d 237, 261 (1985). The trier of fact has the responsibility to assess witnesses' credibility, weigh their testimony, resolve inconsistencies and conflicts in the evidence, and draw reasonable inferences from the evidence. *People v. Sutherland*, 223 Ill. 2d 187, 242 (2006). We will not reverse a criminal conviction based on insufficient evidence unless the evidence is so improbable, unsatisfactory, or inconclusive that it creates a reasonable doubt of the defendant's guilt. *People v. Gray*, 2017 IL 120958, ¶ 35.

¶ 68    We have already discussed the subject of the instruction allowing the jury to consider the other-crimes evidence for the issue of the weight of the drugs purchased the previous day, and have held that the trial court did not err in allowing the instruction. See *supra* ¶¶ 55-56. *Young* does not compel a different result, as the court there held that the instruction was in error because the instruction stated that the jury could consider the other-crimes evidence to determine possession of drugs, which was the same crime with which the defendant was charged, thereby allowing the other-crimes evidence to be considered for propensity. *Young*, 2013 IL App (2d) 120167, ¶ 28. Here, in contrast, the jury instruction did not state that the other-crimes evidence could be considered for the issue of drug induced homicide. Moreover, *Young* also failed to acknowledge the principle that an other-crimes evidence instruction that contains an improper basis for considering the other-crimes evidence is not reversible as long as it also contains a proper basis for considering the evidence, which is a point that *Johnson* noted when distinguishing *Young*. *Johnson*, 2014 IL App (2d) 121004, ¶ 58.

¶ 69 We agree with the State that even setting aside the other-crimes evidence, there was sufficient evidence for a rational trier of fact to conclude beyond a reasonable doubt that defendant delivered one gram or more of heroin. It is true that there was no direct evidence regarding the weight of the drugs defendant sold to Hillier on January 30, 2015. However, " '[a] conviction can be sustained upon circumstantial evidence as well as upon direct, and to prove guilt beyond a reasonable doubt does not mean that the jury must disregard the inferences that flow normally from the evidence before it.' " *People v. Patterson*, 217 Ill. 2d 407, 435 (2005), quoting *People v. Williams*, 40 Ill.2d 522, 526 (1968). Here, Hillier testified that he purchased three half-gram bags of heroin from defendant for $180. His testimony was supported by text messages contained on both his and defendant's phones, in which defendant asked for "3 separate halfs [*sic*]" and defendant replied, "K." Muraski was accepted as an expert in street level narcotics distribution and testified that "three halves" mean 1.5 grams of heroin. He additionally testified that the average price of heroin in McHenry and Lake Counties was about $100 per gram, and that a person should receive at least 1.5 grams of heroin for $160 to $180. A sample of the drugs that Hillier testified defendant sold to him was recovered and found to contain heroin.

¶ 70 Evidence from the January 31, 2015, controlled buy provides additional circumstantial evidence that defendant delivered one gram or more of heroin to Hillier the prior day. Hillier testified that he again asked to buy three half-gram bags of heroin, and this testimony was supported by text messages and recorded conversations. The forensic chemist testified that she tested samples from each bag and that they contained heroin, so the issue in *Jones* of not testing

samples from all packages is not present here.[2] There was a discrepancy regarding the total weight of the drugs, in that the forensic chemist first testified that the total weight of the heroin was "1.036" grams but later testified that the three packages "contained 1.3 grams" of heroin. It is also true that both of these weights are less than the 1.5 grams of heroin Muraski testified that a person would expect to receive for $160 to $180. Significantly, however, it was clear that the packages defendant gave to Hillier on January 31, 2015, contained a total of over one gram of heroin, which is weight that the State alleged that defendant delivered on January 30, 2015.

¶ 71    In sum, considering all of the evidence presented in the light most favorable to the State, there was sufficient evidence for the jury to conclude beyond a reasonable doubt that defendant delivered one gram or more of heroin to Hillier on January 30, 2015.

¶ 72                                III. CONCLUSION

¶ 73    For the reasons stated, we affirm the judgment of the McHenry County circuit court.

¶ 74    Affirmed.

---

[2] Defendant claims that the court in *Jones* " 'held it is 'pure conjecture' to draw any inference regarding *weight* and content of drug packets based on testing of different packets where all of the packets are not shown to be homogenous." (Emphasis added.) The court actually held that "[w]hether the untested packets in the instant case may have contained cocaine or mere look-alike substances is pure conjecture." *Jones*, 174 Ill. 2d at 430. In other words, *Jones* addressed assumptions about the content of the packages, as opposed to their weight.