# Illinois Official Reports

## Appellate Court

---

### *People v. Rosado*, 2017 IL App (1st) 143741

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOE ROSADO, Defendant-Appellant. |
| District & No. | First District, Second Division<br>Docket No. 1-14-3741 |
| Filed<br>Modified upon<br>denial of rehearing | August 1, 2017<br><br>September 12, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 11-CR-6292; the Hon. Maura Slattery Boyle, Judge, presiding. |
| Judgment | Reversed and remanded with directions. |
| Counsel on Appeal | Michael J. Pelletier, Patricia Mysza, and Robert N. Markfield, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Jon Walters, and Michelle Corda, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE HYMAN delivered the judgment of the court, with opinion.<br>Presiding Justice Neville and Justice Mason concurred in the judgment and opinion. |

**OPINION**

¶ 1     Before this case was tried, a jury acquitted Joe Rosado of delivering, on March 29, 2011, a controlled substance to an undercover police investigator. After the acquittal, before a different jury but the same judge, Rosado was tried in this case for delivering a controlled substance to the same undercover police investigator on March 23, six days before March 29. The State was allowed to present testimony that Rosado had sold drugs on March 29; however, Rosado was not allowed to tell the jury of his acquittal. On appeal, Rosado challenges both evidentiary rulings. We find that the trial court abused its discretion: the March 29 testimony was not proper other-crimes evidence, and Rosado should have been allowed to inform the jury of his acquittal. We reverse his conviction and remand for a new trial.

¶ 2                                       BACKGROUND

¶ 3     In 2011, Rosado was arrested for and charged with a series of drug transactions that allegedly took place within a two-week period in March 2011. In case No. 6287, Rosado was charged with selling drugs on March 18, 2011. In this case (case No. 6292), he was charged with delivering 15 to 100 grams of cocaine within 1000 feet of a high school on March 23, 2011. Finally, in case No. 6291, he was charged with selling drugs on March 29, 2011. He was arrested on April 1, 2011.

¶ 4     The State elected to try the case involving the March 29 transaction first. Before trial, the State moved to admit evidence of both the March 18 and the March 23 incidents as "other crimes" evidence. The trial court denied this motion, reasoning that the evidence was more prejudicial than probative and that the jury might convict Rosado based on the other-crimes evidence. At the jury trial, Rosado argued that his brother, Javier Moreno, had sold the drugs; Rosado was acquitted.

¶ 5     Before trial in this case, the State nevertheless moved to admit evidence of the March 29 incident as "other crimes" evidence, to show identity. The trial court admitted the evidence over Rosado's objection, without referencing whether the evidence was more probative than prejudicial. The trial court also stated that in its opinion, Rosado had only been acquitted because the State "did not handle that case correctly because the evidence in the tape on that case was quite clear" and that the trial court "would have had a different view" of the evidence than the jury that acquitted him. The trial court also denied Rosado's request to inform the jury that he had been acquitted of selling drugs on March 29.

¶ 6     During opening argument, the State referred to the March 29 drug sale; Rosado's counsel then told the jury that it should not consider the March 29 sale, but concern itself with the charges at issue.

¶ 7     Officer Emerico Gonzalez testified that on March 23, 2011, he was assigned to purchase narcotics from Rosado. Gonzalez, wearing civilian clothes and driving a civilian vehicle, was the "undercover" officer, while other police officers performed surveillance and enforcement. Gonzalez had a recording device, marked money with which to buy the drugs, and a cell phone number that had been given to him by Rosado.

¶ 8     When Gonzalez entered the restaurant, a woman greeted him, and he told her that he was looking for Jose. She corrected him and told him he was looking for "Joe Joe." Gonzalez did not see Rosado in the restaurant, so he asked the woman if she could call Joe Joe. The woman

did but told Gonzalez that Joe Joe was not answering the phone. Gonzalez called the number he had been given, but no one answered. The woman made a second phone call and held a conversation. She informed Gonzalez that Joe Joe would be there around 3 p.m. Gonzalez walked out of the restaurant to his car and then received a call from Rosado. A recording of this call and a transcript (translated into English from Spanish) were presented to the jury:

> "Gonzalez: I wanted to ask you can we do something today?
> Answer: What do you want[,] the same thing?
> Gonzalez: Yea yea, the same thing you gave me before for 800.
> Answer: Okay can you give me five minutes I'll call you back, in five minutes.
> Gonzalez: Five minutes, okay I'll be waiting for you inside then."

¶ 9 Gonzalez went back into the restaurant and sat down at a table. There were two or three people in the restaurant. Rosado entered, wearing a brown jacket and light colored pants, and gestured to Gonzalez to wait, then went into the kitchen area. Gonzalez saw Rosado's back. After one or two minutes, Rosado gestured for Gonzalez to follow him into the men's restroom. There, Rosado placed a plastic bag containing cocaine on the counter, and Gonzalez gave Rosado $800 in marked bills. Gonzalez could see the side and front of Rosado's face, from two or three feet away. Gonzalez placed the bag in his waistband, and both men walked out. Gonzalez returned to his car and notified the others of the purchase. The contents of the bag tested positive for cocaine. At 4:25 p.m., Gonzalez viewed a photo array and identified Rosado as the man who had sold him the drugs. Rosado was arrested on April 1, but Gonzalez did not know if any of the marked bills had been recovered after the arrest.

¶ 10 Gonzalez knew Rosado's brother, Javier Moreno, because he also was investigating Moreno for drug sales. Both brothers were Hispanic with black hair, brown eyes, and goatees. Gonzalez compared pictures of both men and testified that their hairlines and facial hair were slightly different and that Rosado is slightly older and taller than Moreno. Both brothers spoke Spanish but had different voices and mannerisms and different cell phone numbers. Gonzalez testified that the man he spoke to and purchased drugs from on March 23 was Rosado, not Moreno, because Moreno had a tattoo on his hands and the man in the restroom did not have that tattoo. Moreno's picture was not in the photo array viewed by Gonzalez.

¶ 11 Gonzalez went on to describe an undercover drug purchase made six days later, on March 29. This transaction took place in Gonzalez's car outside the same restaurant, and he bought 4½ ounces of cocaine from Rosado for $3100. He denied purchasing drugs from Moreno on March 29.

¶ 12 Gonzalez stated that he had seen Rosado and purchased drugs from him before March 23, but he did not remember the date. It was possible that he had talked to Moreno on March 24, 25, or 26 and possibly bought drugs from Moreno on March 24 and 26.

¶ 13 Officer Robert Ramirez testified that he was an enforcement officer during the March 23 drug purchase, stationed near the restaurant. After the purchase, Ramirez used a police computer to generate a photo array. Ramirez knew that Rosado's picture was in the photo array and knew which photo was Rosado's. He presented the array to Gonzalez, who identified Rosado. Ramirez also worked on the March 29 investigation but did not present a photo array to Gonzalez after that purchase.

¶ 14 Officer David Torres testified that on March 23, he was working as a surveillance officer. Torres parked in a car at the northwest corner of the intersection (kitty-corner from the

restaurant) with the car facing away from the restaurant. Torres remained in his car throughout. He saw Gonzalez arrive in a civilian car and go into the restaurant, then return to his car a few minutes later. Gonzalez had a phone conversation, then re-entered the restaurant. A few minutes later, a man with a goatee and wearing a brown jacket and light colored pants entered the restaurant. Torres saw the man's profile and identified him as Rosado. A few minutes later, Torres heard a radio report from Gonzalez that the drug transaction had been successful. Torres also testified that he had worked as a surveillance officer on March 29. He testified that he did not see Moreno on March 29 or March 23, did not see Rosado on March 29, and did not know if Moreno had been in the restaurant on March 23.

¶ 15    Officer Joseph Watson testified that during the March 29 drug purchase, he was assigned to surveillance and was parked on the north side of Cermak Road, across the street from the restaurant. Watson saw Rosado driving a white Ford Expedition and turning off Cermak onto Christiana Avenue. Gonzalez had already parked outside the restaurant and gone inside. Rosado parked on Christiana and also went inside; Watson could see Rosado's back but did not remember what Rosado wore. After a few minutes, Gonzalez and Rosado left the restaurant and got into Gonzalez's car; then Rosado went back into the restaurant, and Gonzalez alerted the other officers of a drug purchase. Watson could not see what had occurred in Gonzalez's car. Watson also worked as a surveillance officer on March 23, again parked across the street from the restaurant. He denied seeing Moreno on either March 23 or March 29.

¶ 16    During closing arguments, the State referred to the March 29 purchase, arguing that the purchase identified Rosado because of its similarities to the March 23 purchase. Rosado's counsel argued that Gonzalez had little opportunity on March 29 to successfully identify Rosado and that Gonzalez had confused Rosado for his brother, Moreno, who was being investigated during the same time frame. The trial court instructed the jury on the other-crimes evidence: "Evidence has been received that the defendant has been involved in an offense other than that charged in the indictment. This evidence has been received on the issue of the defendant's identification and may be considered by you only for that limited purpose. It is for you to determine whether the defendant was involved in that offense, and, if so, what weight should be given to this evidence on the issue of identification."

¶ 17    The jury found Rosado guilty. In his posttrial motion, Rosado argued that the trial court erred in admitting evidence of the March 29 drug sale and in disallowing evidence of his acquittal for that sale. The trial court denied the motion and sentenced Rosado to seven years of imprisonment. (Rosado pleaded guilty to the March 18 drug sale.)

¶ 18                          STANDARD OF REVIEW

¶ 19    We review the admission of the other-crimes evidence and the trial court's decision not to admit evidence of the acquittal for an abuse of discretion. See *People v. Wilson*, 214 Ill. 2d 127, 136 (2005). An abuse of discretion occurs when a trial court's decision is "arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it." (Internal quotation marks omitted.) *People v. Lerma*, 2016 IL 118496, ¶ 23.

ANALYSIS

## Admission of Other-Crimes Evidence

Rosado first contends that the trial court abused its discretion in admitting evidence of the March 29 drug sale as other-crimes evidence. Other-crimes evidence is inadmissible to show a defendant's propensity to commit crime because a jury might convict the defendant not based on the evidence adduced at trial, but on the notion that defendant deserves punishment. *People v. Placek*, 184 Ill. 2d 370, 385 (1998). Such evidence can be admitted, however, to prove intent, *modus operandi*, identity, motive, absence of mistake, or any relevant, material fact other than propensity. *People v. Donoho*, 204 Ill. 2d 159, 170 (2003). But even when this evidence is admissible, the trial court still must weigh its prejudicial effect versus its probative value and exclude it if its prejudicial effect substantially outweighs its probative value. *Placek*, 184 Ill. 2d at 385. The State's proof of the other crime need not be beyond a reasonable doubt "but must be more than a mere suspicion." *People v. Davis*, 248 Ill. App. 3d 886, 893 (1993). And "the mere fact of acquittal does not necessarily mean that [the] defendant did not commit the alleged other offense." *People v. Baldwin*, 2014 IL App (1st) 121725, ¶ 73.

The State argues that Officer Gonzalez's identification of Rosado was the core issue at trial and the March 29 evidence "lent credibility to the officers' identification of [Rosado], showed that a relationship between the parties was established, and gave a more complete picture of the crime charged." In support, the State directs us to *People v. Vazquez*, 180 Ill. App. 3d 270 (1989). But *Vazquez* actually illustrates the evidentiary problem with the State's argument.

*Vazquez* was charged with two counts of selling drugs, once on June 12 and another sale on July 2. *Id.* at 276. The State chose to try *Vazquez* for the July 2 sale and used evidence of the June 12 sale. *Id.* The *Vazquez* court accepted this evidence to refute *Vazquez*'s defense that he had not been involved in the July 2 sale, to bolster the State's identification of *Vazquez* as the seller, and to show the relationship between buyer and seller. *Id.* at 278.

What occurred here is precisely backwards from *Vazquez*. There, the evidence used was of a prior sale. The officers could successfully identify *Vazquez* on July 2 and were able to buy drugs with ease because they recognized him from June 12 and had already established a buyer-seller relationship. Here, the State submitted evidence from a *later* sale, on March 29. But the officers did not explain how their ability to recognize Rosado on March 23, both in person and in the photo array that same day, was somehow increased based on what they saw six days later on March 29. Further, the March 29 evidence could not explain how the buyer-seller relationship had already been established on March 23. (The same logical problem applies to another case cited by the State, *People v. Bowman*, 227 Ill. App. 3d 607 (1992), where a witness testified that she recognized the defendant from a previous drug sale.)

The trial court abused its discretion in admitting this evidence because it could not bolster identification (the only basis on which it was admitted) and had no other relevance; it also was, as such, more prejudicial than probative.

## Evidence of Rosado's Acquittal

Rosado further argues that the trial court erred in not allowing him to inform the jury that he already had been tried and acquitted of the March 29 drug sale. Rosado relies primarily on *People v. Ward*, 2011 IL 108690.

¶ 29     Ward was accused of sexually assaulting two women, M.M. and L.S. *Id.* ¶¶ 5-6. Ward was first tried for assaulting L.S. but was acquitted after arguing that L.S. had consented. *Id.* ¶ 5. In the M.M. trial, the State asked to admit evidence of the assault on L.S. under section 115-7.3 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-7.3 (West 2006)), which allows admission of prior sexual crimes to show propensity. *People v. Ward*, 2011 IL 108690, ¶ 7. The trial court allowed this evidence but ruled that Ward's counsel could not present evidence that he had already been tried and acquitted of assaulting L.S. *Id.* ¶ 10. L.S. testified at the M.M. trial and briefly referred to the fact that she had testified before. *Id.* ¶ 14. The jury was instructed multiple times that it must decide whether Ward had committed the offense against L.S. and how much weight to give to that evidence. *Id.* ¶ 15.

¶ 30     The Illinois Supreme Court held that the trial court abused its discretion in excluding the evidence of Ward's acquittal. The supreme court determined that the acquittal was certainly probative of the issue, since "the complete absence of any reference to the outcome in that case severely restricted defendant's ability to convey a complete context for L.S.'s allegations." *Id.* ¶ 39. And the potential for unfair prejudice was high, given the inflammatory nature of the allegations, and the jury instruction that Ward had been "involved in an offense" implied that Ward had been charged, and perhaps convicted, of assaulting L.S. (Emphasis and internal quotation marks omitted.) *Id.* ¶¶ 44-45. Finally, the court held that the error was not harmless, as the propensity evidence was quite important in a case where the sole issue in dispute was Ward's consent defense. *Id.* ¶ 49.

¶ 31     The State argues that *Ward* is distinguishable because the evidence of the March 29 drug sale was not overly inflammatory and was used for identification purposes instead of propensity and that the acquittal was not obviously relevant to the identification. *Ward* indeed differs, particularly in that the other-crimes evidence in *Ward* was admitted as propensity evidence under a specific statute, as opposed to this case, where the evidence could only be admitted as something other than propensity under the standard rules of evidence. And the evidence of the March 29 transaction was certainly not inflammatory as was L.S.'s description of sexual assault.

¶ 32     But nowhere does *Ward* limit its holding to prior cases of sexual assault admitted under section 115-7.3 or to cases involving emotional, wrenching testimony from sympathetic victims. *Ward*'s holding, which enforces the familiar principles of relevance, probative value, and unfair prejudice, applies with equal force here.

¶ 33     The State argues that "the acquittal was not directly relevant to identity." We do not know whether that is true, as we will never know the jury's reasoning. But in both the March 23 and March 29 cases, the central question was identification, enough to invoke *Ward*'s holding.

¶ 34     Rosado relies on *People v. Bedoya*, 325 Ill. App. 3d 926 (2001), where Bedoya's conviction was reversed because the jury was not told that Bedoya had been acquitted of aggravated discharge of a firearm, though that charge was used as other-crimes evidence in a subsequent trial. The State attempts to distinguish *Bedoya* by arguing that the jury instruction given to Rosado's jury was less prejudicial than that given in *Bedoya*. Contrary to the State's representation, the jury in this case appears to have been given the same instruction as in *Bedoya*, the pattern instruction: "Evidence has been received that the defendant has been involved in an offense other than that charged in the indictment," and the jury must determine "whether the defendant was involved in that offense." Illinois Pattern Jury Instructions, Criminal, No. 3.14 (3d ed. 1992). Like the *Bedoya* court, we also are concerned that "[t]he jury

could have been left with the false impression that those 'offenses' were alive and pending." *Bedoya*, 325 Ill. App. 3d at 943. The acquittal definitely relates to one of the tasks given by the instruction: determining whether Rosado was, in fact, involved in the March 29 offense.

¶ 35    The trial court should have allowed Rosado to introduce evidence of his acquittal. The acquittal was relevant, in that it made "the existence of any fact that is of consequence to the determination of the action more probable or less probable." Ill. R. Evid. 401 (eff. Jan. 1, 2011). And it was highly probative on the crucial issue of identification. Did the police officers (especially Officer Gonzalez) recognize the man who sold the drugs on March 23 as Rosado? Or did they have him mixed up with his brother Moreno, who was also being investigated by the same officers during the same time period? The evidence of the March 29 acquittal would have provided the jury with a "complete context" for Officer Gonzalez's allegations that Rosado had sold him drugs that day—especially in light of Officer Gonzalez's vehement protestations that Rosado, not Moreno, had sold the drugs on March 29. The acquittal would have strongly impeached Officer Gonzalez's testimony, and he was the most consequential witness against Rosado—the only officer who saw the drug seller up close.

¶ 36    When admitting other-crimes evidence, we often warn trial courts not to allow a "mini-trial" on the other crime, since that could confuse the jury and waste time. *Ward*, 2011 IL 108690, ¶ 39. But if a trial court is going to admit it, the trial court must do so equitably. Rosado should have been allowed to tell the jury about the acquittal.

¶ 37    Beyond these timeworn evidentiary rules, a question of basic fairness must be dealt with. The State chose to try the March 29 case before the March 23 case. Rosado, for whatever reason, was acquitted. And yet, the State was allowed to proceed with the March 23 case as though the acquittal never happened and re-present the March 29 evidence to a second jury, forcing Rosado to defend himself again. Further, the trial court allowed the State to use other-crimes evidence in this case after having denied leave to do so in the March 29 case, concluding there that the evidence was more prejudicial than probative. The record does not reveal a sound reason for why the trial court made an about-face and ruled to the contrary here. Both in terms of logic and fairness, the trial court's decision was "unreasonable" and an abuse of discretion.

¶ 38                                The Errors Are Not Harmless

¶ 39    The State argues that overwhelming evidence of guilt shows that any errors were harmless beyond a reasonable doubt. See *People v. Patterson*, 217 Ill. 2d 407, 434 (2005). But the State's brief then equates "overwhelming" evidence with evidence that is "not closely balanced." "Closely balanced" is part of a plain error analysis, not harmless error. *People v. Thompson*, 238 Ill. 2d 598, 613 (2010). Many attorneys (and judges, for that matter) find this area of law confusing, and we will not further muddy the waters by importing "not closely balanced" into harmless error analysis.

¶ 40    Improper admission of other-crimes evidence is harmless if the defendant has not been prejudiced or denied a fair trial, and the State must show beyond a reasonable doubt that the result would have been the same without the improper admission. *People v. Gregory*, 2016 IL App (2d) 140294, ¶ 28. We will consider whether the other-crimes evidence was a "material factor" in the conviction. *Id.*

¶ 41    The State has not shown that these errors were harmless beyond a reasonable doubt. Officer Gonzalez spoke with someone who answered Rosado's cell phone and discussed a

drug transaction, but the conversation was short, and the other party did not identify himself. None of the other officers saw the drug seller up close; they were parked on the opposite side of the intersection from the restaurant. The case depended on Officer Gonzalez, who had also been investigating Moreno at the same time and admitted he could not remember which days he had bought drugs from Moreno. There was no physical evidence tying the drugs or the money to Rosado. Officer Gonzalez's testimony might have been sufficient to support a conviction, but that is not the same thing as "overwhelming" evidence. See *People v. Hogan*, 388 Ill. App. 3d 885 (2009) (finding evidence was sufficient to support conviction, but not overwhelming for harmless error analysis). So the March 29 evidence was a "material factor" in the jury's decision.

¶ 42                    Instructions on Remand on Denial of Petition for Rehearing

¶ 43        Rosado is entitled to a new trial. In our original opinion, we remanded the case to the presiding judge of the criminal division of the circuit court with instructions that the case be assigned to a different judge for any further proceedings, under Illinois Supreme Court Rule 366(a)(5) (eff. Feb. 1, 1994). The State has now petitioned for rehearing, arguing that we do not have that power under Rule 366 and that we failed to explain our reasoning for those instructions. Indeed, we did not explain—out of a desire to spare the trial court some embarrassment. But since the State asks for an explanation, we will provide one.

¶ 44        In ruling on the other-crimes issue, the trial court made specific comments regarding the jury's verdict in acquitting Rosado on the March 29 transaction. The judge stated that the evidence against Rosado was "quite clear." It attributed the acquittal to the prosecutors not asking the right questions and leaving issues "up in the air," which allowed Rosado's attorneys to argue reasonable doubt.

¶ 45        Here, the trial court reversed its own evidentiary rulings between cases (for no discernible reason) and then made a lengthy statement indicating its belief in Rosado's guilt. We have not ordered the case reassigned due to trial court error in its evidentiary rulings. See *People v. White*, 2017 IL App (1st) 142358, ¶ 43 (though trial court's evidentiary rulings were erroneous, reviewing court will not reassign matter on remand because there was "no indication that the court will not follow the law on remand"). Outward appearances would suggest that the trial court changed its evidentiary rulings in the second case to ensure that Rosado was not acquitted again. This raises the type of situation that requires reassignment, to avoid even the appearance of bias. See, *e.g.*, *People v. Montanez*, 2016 IL App (1st) 133726, ¶ 44 (on remand for third-stage postconviction proceedings, case should be reassigned where original postconviction judge "has already ruled that no contrary verdict could ever stand" and "expressed a disregard for the evidence presented").

¶ 46        The State argues that we do not have the power to reassign the case under Rule 366, which, it maintains, is reserved only for civil cases. But many courts have ruled otherwise and used Rule 366 for reassignment in criminal cases. See *Eychaner v. Gross*, 202 Ill. 2d 228, 279 (2002) (Rule 366 authority "includes the power to reassign a matter to a new judge on remand"); *White*, 2017 IL App (1st) 142358, ¶ 42; *Montanez*, 2016 IL App (1st) 133726, ¶ 44; *People v. Serrano*, 2016 IL App (1st) 133493, ¶ 45; *People v. Tally*, 2014 IL App (5th) 120349, ¶ 43.

¶ 47        The State has cited no direct authority for its argument. Instead, it argues that our powers are instead governed by Illinois Supreme Court Rule 615. That rule allows us to "set aside,

affirm, or modify any or all of the proceedings subsequent to or dependent upon the judgment or order from which the appeal is taken." Ill. S. Ct. R. 615(b). But, the State argues, since those powers have been limited by the supreme court in a completely different context, we do not have the power to direct the presiding judge of the criminal division to reassign the case. While in *People v. Castleberry*, 2015 IL 116916, ¶ 26, the supreme court ruled that an appellate court did not have the power under Rule 615 to modify an illegal sentence, the *Castleberry* court was not asked and did not rule on whether an appellate court has the same power to reassign a case under Rule 615 as it does under Rule 366. This judicial power is necessary for an appellate court, and we can see no reason why we should have that power in civil cases but not in criminal ones. The petition for rehearing is denied.

¶ 48       Reversed and remanded with directions.