**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2025 IL App (3d) 230255-UB

Order filed May 8, 2025

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2025

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 12th Judicial Circuit, Will County, Illinois. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-23-0255 Circuit No. 20-CF-897 |
| NATHANIEL R. HILL, | ) ) ) | Honorable Daniel D. Rippy, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE DAVENPORT delivered the judgment of the court.
Justices Holdridge and Peterson concurred in the judgment.

_____

**ORDER**

¶ 1      *Held*:   The trial court erred in admitting an improperly recorded phone conversation.

¶ 2      This case returns to us via a supervisory order. *People v. Hill*, No. 131237 (Ill. Jan. 29, 2025). Defendant, Nathaniel R. Hill, was convicted of first degree murder and unlawful use of a weapon by a felon (UUWF), and he was sentenced to consecutive prison terms of 75 years and 5 years, respectively. In a prior order, we affirmed the trial court's judgment as it concerned defendant's UUWF conviction. However, we reversed defendant's first degree murder conviction

and remanded for further proceedings. *People v. Hill*, 2024 IL App (3d) 230255-U. We held the trial court erred when it admitted, over defendant's objection, a recording of a phone conversation to which defendant was a party. In our analysis, we considered and rejected the State's argument that the error was "harmless beyond a reasonable doubt," which is the standard applicable to constitutional harmless errors. Though we recognized the error at issue was evidentiary, not constitutional, we found the State had "acceded" to the constitutional harmless-error standard by arguing the error was harmless beyond a reasonable doubt.

¶ 3    The State petitioned the supreme court for leave to appeal. The supreme court denied the petition but, exercising its supervisory authority, directed us to vacate our judgment and "reconsider the issue of whether the erroneous admission of the recorded phone conversation involving defendant was harmless error under the proper standard of review for evidentiary harmless error and determine if a different result is warranted." *Hill*, No. 131237 (Ill. Jan. 29, 2025).

¶ 4    Per the supervisory order, we vacate our prior judgment. Upon reconsideration, we conclude the erroneous admission of the recorded phone conversation was not harmless under the evidentiary harmless-error standard. Therefore, we affirm in part, reverse in part, and remand for further proceedings.

¶ 5                                I. BACKGROUND

¶ 6    A grand jury indicted defendant on two counts of first degree murder (720 ILCS 5/9-1(a)(1), (2) (West 2020)) and two counts of UUWF (*id.* § 24-1.1(a), (e)). The charges stemmed from the June 12, 2020, shooting death of Derrick Williams-Scott. Before trial, defendant moved *in limine* to introduce evidence of Williams-Scott's aggressive and violent character through his prior convictions for various forms of battery and reckless discharge of a firearm. At a hearing on

2

the motion, defendant confirmed he sought the introduction of this evidence to bolster his contention that Williams-Scott was the initial aggressor in the incident. The State argued the evidence was inadmissible because there was no question that Williams-Scott was the initial aggressor. The court declined to rule on the motion, reasoning that until a showing of self-defense had been made, a ruling would be premature. The court, however, denied the motion before the start of trial.

¶ 7      The case proceeded to a jury trial on one count of first degree murder and one count of UUWF. The State dismissed the other charges before trial. Relevant to this appeal, the evidence showed that at approximately 11:30 p.m. on June 11, 2020, officers responded to a domestic disturbance at the residence Williams-Scott shared with Florine Hale in Joliet. Williams-Scott agreed to leave the residence and told officers he would obtain a ride from a vehicle, a Buick, that had just arrived in the driveway.

¶ 8      Shortly after midnight, officers were called back to the residence. The vehicle was no longer in the driveway. Officers observed Williams-Scott bleeding with gunshot wounds to his chest and wrist. Officers were informed the shooter was a man who had been with a woman named Cassandra.

¶ 9      Outside the jury's presence, the State told the court it was seeking to introduce a recording of a phone conversation between Hale and defendant. Hale received the call from defendant during her interview with detectives, which was audio and video recorded. Hale was aware her statement was being recorded and answered the call on speaker so the conversation could be heard by the detectives. The State intended to introduce the audio portion of the recording through the next witness, Cassandra Dorris, and the video portion of the recording with a subsequent witness. Defendant was previously unaware the State intended to introduce the recording and objected to

its admission in part because he was unaware the conversation was being recorded. The court found the recording was admissible because Hale was not acting at the detectives' direction.

¶ 10 Dorris testified she and defendant were dating in June 2020. On the night of June 11, she and defendant drove in her vehicle, the Buick, to Hale's residence to retrieve Dorris's phone charger. Dorris pulled into the driveway and noticed the police were at the residence. As she was exiting the vehicle, she saw Williams-Scott walking from the residence with officers and heading toward her vehicle. Dorris retrieved her charger and returned to her vehicle. She saw Williams-Scott seated in the rear passenger seat as she entered the vehicle. Defendant and Williams-Scott were having a conversation. She did not pay attention to what was being said but the conversation did not seem unusual.

¶ 11 Williams-Scott requested they give him a ride to his grandmother's residence. Dorris told Williams-Scott they were not headed in that direction, so defendant denied the request and told Williams-Scott to exit the vehicle. Defendant and Williams-Scott argued for a while. Dorris attempted to exit the vehicle to bring Hale to retrieve Williams-Scott from the vehicle but stopped when defendant told her to "[g]et [her] m*** f*** a*** back in the car." Dorris returned to the driver's seat while the men continued to talk. Williams-Scott said defendant would have to make him get out of the vehicle. Williams-Scott did not raise his voice during the exchange, and his movements and speech were slow and not aggressive. Defendant's voice was loud, which was normal for him. In her peripheral vision, Dorris saw Williams-Scott "reach up front, [and defendant]'s glasses fall off." Dorris testified Williams-Scott did not punch defendant in the back of the head. Instead, she described his conduct as a "tap" or open-handed hit that knocked defendant's glasses off. Dorris heard the rear passenger door close, after which defendant quickly "jump[ed] out of the car." Dorris heard gunshots immediately upon defendant's exit. There was

4

no delay between defendant leaving the vehicle and the gunshots. She did not hear any fighting, talking, or yelling outside of the vehicle.

¶ 12        Dorris panicked and began to drive away. Defendant jumped back into the vehicle. She asked defendant repeatedly why he had done that. Defendant kept yelling at her to "[s]hut the f*** up and drive." Hale began calling Dorris. Dorris told defendant he needed to speak with Hale. Defendant eventually spoke with Hale over the phone while Dorris sat next to him. Dorris recalled hearing defendant say "I don't know what you are talking about" to Hale but could not recall the conversation verbatim. Dorris testified she had heard the audio portion of the phone call between defendant and Hale and recognized their voices. The audio portion of the recording was played for the jury. On the recording, Hale can be heard repeatedly asking defendant why he shot Williams-Scott. Defendant repeatedly denied shooting Williams-Scott and also responded that Williams-Scott hit him.

¶ 13        On cross-examination, Dorris testified she was interviewed by police on June 12, 2020. She did not recall telling the police that Williams-Scott had been insulting and threatening defendant. She also denied telling the police there had been a delay between defendant exiting the vehicle and hearing the gunshots, saying her "story did not change" and reiterating that the gunshots occurred immediately after defendant exited the vehicle.

¶ 14        Sergeant Aaron Bandy testified he and other officers obtained Dorris's keys and entered her apartment. They encountered defendant, walking naked from the back of the apartment, and detained him. Bandy observed no visible injuries on defendant. When Bandy spoke with Dorris, she told him there had been an argument in her vehicle and Williams-Scott had "punched" defendant. Dorris said they had driven away in silence. Dorris also said Williams-Scott was under the influence of drugs and alcohol.

5

¶ 15 Detective Michael Cagle testified that, during his interview with Hale, Hale received a phone call from defendant. Hale answered the call on the speaker while the interview was being audio and video recorded. Cagle had viewed the video of the phone call, and it fairly and accurately depicted defendant and Hale's conversation. The video (with its audio content) was played for the jury.

¶ 16 Dorris told Cagle that defendant and Williams-Scott argued in her vehicle about providing Williams-Scott with a ride. Cagle did not recall Dorris using the word punch, but she did tell him Williams-Scott hit defendant from the backseat. Dorris informed Cagle that Williams-Scott said "something about you're dead" to defendant. Dorris gave Cagle conflicting timelines, stating both that the gunshots occurred immediately and did not occur until a short time after the men exited the vehicle.

¶ 17 Forensic pathologist Dr. Michel Humilier testified he performed the autopsy on Williams-Scott. Williams-Scott died of multiple gunshot wounds. He also had multiple abrasions on his left shoulder, both forearms, both knees, and right hand. Humilier could not determine how those minor injuries occurred. In addition, Williams-Scott had ecstasy, alcohol, and marijuana in his system.

¶ 18 The State also admitted a certified copy of defendant's 2015 felony conviction (driving while license revoked).

¶ 19 Defendant testified he was acquainted with Williams-Scott and had never had any issues or problems with him. The two men were similarly sized. On the evening in question, he rode with Dorris to Hale's house to retrieve her cell phone charger. Because it was late, defendant decided to bring his gun with him and carried it in his pocket. Defendant acknowledged his 2015 felony conviction.

6

¶ 20    Defendant remained in the vehicle while Dorris entered the residence. Williams-Scott approached the vehicle and forced his way into the rear passenger seat. Williams-Scott was intoxicated, belligerent, and obnoxious. After a brief conversation, Williams-Scott asked for a ride. Defendant refused because they were not traveling in the direction Williams-Scott was requesting. The conversation escalated, and Williams-Scott became aggressive and started calling defendant insulting names. A short time later, Dorris returned to the vehicle and also refused to give Williams-Scott a ride. Williams-Scott began threatening defendant. According to defendant, Williams-Scott swore "on his friend's grave that he would kill [defendant]."

¶ 21    At this point, the altercation turned physical. Williams-Scott punched defendant hard in the head, knocking defendant's glasses off his face. Defendant "duck[ed] to get out of the way of the punches." He could not see without his glasses on. Defendant indicated he was afraid he would be injured and did not know whether Williams-Scott was carrying any weapons. Defendant exited the vehicle to get away from Williams-Scott. By the time defendant exited, Williams-Scott was already outside, continuing to attack defendant. According to defendant, everything happened very quickly. The two men "tussle[d]" for approximately two minutes. Defendant "pull[ed] out the gun and *** [shot]" Williams-Scott. Defendant was not trying to kill Williams-Scott when he shot the gun and did not realize at first the bullets had struck Williams-Scott. Defendant entered Dorris's vehicle. They drove away in silence before Dorris asked defendant what had happened. Defendant was scared and told her nothing had happened. Eventually, defendant spoke with Hale on the phone at Dorris's prompting. He did not want to speak with her. Defendant told Hale that Williams-Scott had attacked him.

¶ 22    On cross-examination, defendant testified he carried a gun for his safety. Williams-Scott continued to strike at him after the initial punch, and defendant viewed the entire altercation, both

7

inside and outside the vehicle, as a continuous attack. Defendant repeatedly attempted to block and push away Williams-Scott. Defendant pulled out his gun because he was scared. Defendant did not have the opportunity to aim the gun, nor did he fire into the air or at the ground. Defendant "fired the two shots and *** jumped in the car." During the altercation, defendant suffered a laceration on his eye and scratches on his arms.

¶ 23    At the close of evidence, the court asked whether the defense wanted an instruction on second degree murder read to the jury. Defense counsel told the court he had consulted with defendant, and they did "not wish to proceed with the second degree." Defendant confirmed this upon the court's inquiry to him. The jury was instructed on self-defense. The State discussed the phone conversation between defendant and Hale during both its closing and rebuttal arguments, arguing defendant's denials and demeanor undermined his credibility and rebutted his claim of self-defense. Defense counsel's closing arguments focused on the reasonableness of defendant's actions in defending himself against Williams-Scott. The jury found defendant guilty of first degree murder and UUWF. The jury also found defendant personally discharged a firearm which proximately caused Williams-Scott's death.

¶ 24    Defendant filed a posttrial motion, arguing, among other things, the court erred when it admitted the recording of his phone conversation with Hale. The court denied the motion and sentenced defendant to consecutive terms of 75 years' imprisonment for first degree murder and 5 years' imprisonment for UUWF. The court denied defendant's motion to reconsider sentence, and this appeal followed.

¶ 25                                II. ANALYSIS

¶ 26    On appeal, defendant contends, among other things, the trial court erred in admitting the recorded phone conversation between defendant and Hale. Defendant argues that when, as here,

8

the police record a private conversation without judicial approval or both parties' consent, such recording is statutorily barred from being used as evidence. The State concedes the recording was improperly made, and the audio of the recording should not have been played for the jury. The State, however, argues the improper recording should not be suppressed under the good-faith exception to the exclusionary rule and, in any event, the error of playing the recording for the jury was harmless.

¶ 27    The Illinois eavesdropping statute prohibits the knowing and intentional interception, recording, or transcribing of "any private electronic communication to which he or she is not a party unless he or she does so with the consent of all parties to the private electronic communication." 720 ILCS 5/14-2(a)(3) (West 2020). Under article 108A of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/art. 108A West 2020)), law enforcement officers may obtain a judicial order authorizing the use of eavesdropping devices or apply for an order up to 48 hours after the usage in certain emergency situations. 725 ILCS 5/108A-1, 108A-6 (West 2020). "Any evidence obtained in violation of [the eavesdropping statute] is not admissible in any *** criminal trial" except in limited circumstances which are not present here. 720 ILCS 5/14-5 (West 2020).

¶ 28    This court has recognized " 'Illinois citizens are entitled to be safeguarded from unnecessary governmental surveillance and other unreasonable intrusions into their privacy.' " *People v. Cunningham*, 2012 IL App (3d) 100013, ¶ 22 (quoting *People v. Bockman*, 328 Ill. App. 3d 384, 388 (2002); *People v. Monoson*, 75 Ill. App. 3d 1, 5 (1979). Thus, we must strictly construe the statutory restraints on eavesdropping (*People v. Calgaro*, 348 Ill. App. 3d 297, 301 (2004)), including its prohibition on using as evidence illegally recorded phone calls.

9

¶ 29        The parties agree, as do we, that the phone conversation was improperly recorded, and the eavesdropping statute plainly barred its use at trial. The State presented no evidence that defendant consented to the recording, let alone that he was aware the private conversation was being recorded. Nor did the State present evidence that law enforcement complied with the requirements of article 108A, either before or after the conversation was recorded, to obtain an order authorizing the eavesdropping.

¶ 30        The State nevertheless asserts the audio recording should not be suppressed under the good-faith exception to the exclusionary rule. The exclusionary rule is a judicially created remedy for fourth amendment violations. *People v. Sutherland*, 223 Ill. 2d 187, 227 (2006). Its sole purpose is to deter future police misconduct. *People v. LeFlore*, 2015 IL 116799, ¶ 22. Exclusion is not required if the State establishes the police acted in good-faith, that is, "the particular circumstances of a case show that police acted with an objectively reasonable good-faith belief that their conduct [was] lawful, or *** their conduct involved only simple, isolated negligence." (Internal quotation marks omitted.) *Id.* ¶ 24. Thus, the exclusionary rule "is invoked only where police conduct is both sufficiently deliberate that deterrence is effective and sufficiently culpable that deterrence outweighs the cost of suppression." (Internal quotation marks omitted.) *Id.*

¶ 31        We conclude the good-faith exception to the exclusionary rule cannot be applied under the circumstances of this case. None of the authority the State cites in its brief applied the good-faith exception to such evidence. Again, the exclusionary rule and its exceptions are applied to evidence gathered in violation of a defendant's *constitutional right* to be free from unreasonable searches and seizures. *Sutherland*, 223 Ill. 2d at 227. And the use of eavesdropping devices does not implicate the fourth amendment when, as here, one party consents. *Calgaro*, 348 Ill. App. 3d at 300-01. Rather, the restrictions on the use of eavesdropping devices in such circumstances "are

10

purely statutory." *Id.* at 301. Here, Hale consented to having the conversation recorded. Thus, the fourth amendment is not implicated. If the fourth amendment is not implicated, we fail to see how its remedy, the exclusionary rule, or any exception can be applied to the present case. Instead, the evidence's admissibility was governed by the eavesdropping statute, which plainly prohibited the evidence's use in this case. 720 ILCS 5/14-5 (West 2020).

¶ 32    Moreover, even if the fourth amendment was implicated, the good-faith exception would not apply. In *People v. Allard*, 2018 IL App (2d) 160927, the court—in the context of a motion to suppress evidence gathered via wiretap under article 108B of the Code (725 ILCS 5/art. 108B (West 2014))—rejected the State's argument that the good-faith exception should apply. The court first found the State had forfeited its argument by failing to raise it in the circuit court. *Allard*, 2018 IL App (2d) 160927, ¶ 42. Forfeiture aside, however, the court explained our legislature (1) has codified the good-faith exception in section 114-12(b)(1) of the Code (725 ILCS 5/114-12(b)(1) (West 2014)), and (2) specifically excepted from its purview evidence gathered by "unlawful electronic eavesdropping or wiretapping" (*id.* § 114-12(b)(4)). *Allard*, 2018 IL App (2d) 160927, ¶ 47.

¶ 33    In reaching this conclusion, we note some courts have considered the good-faith exception in the context of motions to suppress evidence gathered in violation of the eavesdropping statute, even after acknowledging the restrictions on eavesdropping are statutory. See *Bockman*, 328 Ill. App. 3d at 390. The State has the burden to establish good faith. *People v. Turnage*, 162 Ill. 2d 299, 313 (1994). Even if we assume, for argument's sake, the good-faith exception can be applied in this context, the State failed to meet its burden here.

¶ 34    In *Bockman*, the State argued the recorded conversations, purportedly authorized under article 108A of the Code, should not be suppressed under the good-faith exception to the

11

exclusionary rule. *Bockman*, 328 Ill. App. 3d at 390. The court rejected the State's argument and wrote the following:

"In this case ***, the record indicates that the mandatory statutory requirements for an application to use an eavesdropping device were not fulfilled. In addition, nothing in the record shows that [the detective] could have concluded in good faith that the statutory requirements had been satisfied. Therefore, we conclude that the good-faith exception to the exclusionary rule does not apply here." *Id.*

¶ 35    As noted, the State concedes neither the detectives nor the State's Attorney attempted to comply with any of article 108A of the Code's requirements either before or after the phone conversation was recorded. Thus, there was no basis for the detectives to conclude in good faith that the requirements of article 108A had been satisfied. See *id.*

¶ 36    Next, the State asserts the erroneous admission of the recording was harmless. Defendant argues the harmless-error doctrine does not apply given the eavesdropping statute's plain prohibition on using evidence gathered in its violation. He maintains the error alone warrants vacating his conviction.

¶ 37    We find this error is subject to a harmless-error analysis. Generally, only a structural error—a systemic error that erodes the integrity of the judicial process and undermines the fairness of the proceedings—requires automatic reversal. *People v. Pingelton*, 2022 IL 127680, ¶ 44. Otherwise, an error warrants relief only if the complaining party is prejudiced by it. *People v. Michael*, 280 Ill. 11, 13-14 (1917); accord *People v. De Leon*, 40 Ill. App. 3d 308, 312 (1976). Defendant here does not assert the error was structural, and we must therefore assess prejudice.

¶ 38    Because the error was fully preserved for review, the State has the burden to establish the error was not prejudicial, that is, the error was harmless. *People v. McBride*, 2020 IL App (2d)

12

170873, ¶ 33. The standard under which we evaluate a harmless-error claim depends on the type of error at issue. See *id.* ¶ 34 (citing *In re E.H.*, 224 Ill. 2d 172, 180 (2006)). When the error is an evidentiary error, the State must establish there is no reasonable probability that the jury would have acquitted the defendant absent the error. *People v. Nevitt*, 135 Ill. 2d 423, 447 (1990). Stated differently, an evidentiary error is not harmless and warrants reversal "when a reasonable probability exists that the jury would have acquitted the defendant in the absence of the improperly admitted evidence." *People v. Stull*, 2014 IL App (4th) 120704, ¶ 106 (citing *E.H.*, 224 Ill. 2d at 180). When the error is of constitutional nature, however, the State must meet a more exacting standard: it must establish the error was harmless beyond a reasonable doubt. *People v. McClanahan*, 191 Ill. 2d 127, 139 (2000); see *E.H.*, 224 Ill. 2d at 180-81 (noting the bar is higher for constitutional errors).

¶ 39 The error here was not a constitutional error. Thus, we must determine whether there exists a reasonable probability the jury would have acquitted defendant had the illegally recorded phone call been excluded. *Stull*, 2014 IL App (4th) 120704, ¶ 106. In making this determination, we may "(1) focus on the error to determine whether it might have contributed to the conviction; (2) examine the other properly admitted evidence to determine whether it overwhelmingly supports the conviction; or (3) determine whether the improperly admitted evidence is merely cumulative or duplicates properly admitted evidence." (Internal quotation marks omitted.) *People v. Guerrero*, 2021 IL App (2d) 190364, ¶ 88.

¶ 40 Regarding defendant's first degree murder conviction, the State has failed to establish the erroneous admission of the recording was harmless. The State contends the error was harmless because Dorris could have testified to each and every statement she heard defendant say to Hale. To be sure, the State is correct that Dorris could have done so. See Ill. R. Evid. 801(d)(2) (eff. Oct.

13

15, 2015) (a party's statement offered against that party is not hearsay). However, we must evaluate the erroneous evidence as it was presented, not as it might have been. A witness's testimony about a statement is qualitatively different than a recording of the statement. Dorris's memory of defendant's statements was sparse. She merely recalled defendant saying, "I don't know what you are talking about." She did not recall much else of what defendant said and, moreover, she could not hear what Hale was saying to defendant. The audio and audio-video recordings, on the other hand, contained the entire conversation between defendant and Hale, providing their demeanors and tone and the full context of their statements. We reject the State's argument that the error was harmless because the evidence might otherwise have been admitted. *Cf. People v. Becker*, 239 Ill. 2d 215, (2010) (finding the erroneous admission of a victim's prior statement was harmless because it was cumulative to other, properly admitted evidence).

¶ 41        Alternatively, the State argues the error was harmless because the evidence in this case "was not closely balanced." Initially, we note the State's use of the phrase "not closely balanced" in this context is imprecise. Whether the evidence is closely balanced is part of a plain-error, not harmless-error, analysis. *People v. Rosado*, 2017 IL App (1st) 143741, ¶ 39. Thus, we urge litigants to refrain from using this phrase when arguing whether an error is harmless. *Id.* Presumably, what the State means to say is that the other properly admitted evidence overwhelmingly supports defendant's conviction. See *Guerrero*, 2021 IL App (2d) 190364, ¶ 88. We disagree.

¶ 42        The primary issue for the jury was whether defendant was justified in using deadly force. Specifically, the jury had to determine whether defendant reasonably believed (1) his use of force was necessary to defend himself against the imminent use of unlawful force; and (2) if his use of force was intended or likely to cause death or great bodily harm, such force was necessary to

14

prevent imminent death or great bodily harm to himself. Illinois Pattern Jury Instructions, Criminal, No. 24-25.06 (approved Jan. 27, 2023).

¶ 43     The State's evidence concerning this charge, while sufficient to convict (defendant does not contend otherwise), does not overwhelmingly support the conviction. As the State acknowledges, this case was essentially a credibility contest between Dorris and defendant. Although Dorris's and defendant's versions of the events were substantially similar, their accounts diverged when recalling defendant's and Williams-Scott's demeanor during the altercation and when shots were fired after the men exited the vehicle (a fact inconsistently recounted by Dorris).

¶ 44     We acknowledge, as the State argues, that no witness testified defendant had any visible physical injuries as a result of his interaction with Williams-Scott. We also acknowledge defendant was impeached by his prior conviction. However, the record also shows Hale was not entirely consistent when recounting what happened. Simply put, we do not believe the absence of physical injuries or defendant's prior conviction necessarily rebuts defendant's self-defense claim or renders his testimony wholly unbelievable. Because this case hinged on credibility, we cannot say the recording's erroneous admission did not contribute to the jury's verdict. The recording allowed the jury to hear defendant's demeanor and tone shortly after the altercation. Defendant's repeated, nonchalant denials during the conversation could have persuaded the jury to disbelieve he acted in self-defense.

¶ 45     Finally, the State argues that a review of the entire trial record shows the illegally recorded phone call "yielded next to no probative evidence" and "was an extraordinarily minor piece of evidence that most certainly did not tip the scales of justice in the State's favor." In the trial court, however, the State took a much different position regarding the recording's importance, probative value, and potential effect on the jury. The State did not just publish the illegal recording to the

15

jury one time; it asked and was allowed to do so twice (once as audio only and once as audio and video). Moreover, the State spent considerable time discussing the phone call during its closing argument, arguing the phone call undermined—for various reasons—defendant's theory of self-defense. *Cf. People v. Montano*, 2017 IL App (2d) 140326, ¶ 128; *People v. Melton*, 2013 IL App (1st) 060039, ¶ 53. The State's discussion of the recording during its closing and rebuttal arguments spanned approximately six pages of transcript and was the last matter discussed immediately before defendant's sole opportunity to address the jury. Given these circumstances, we find the State's argument unpersuasive.

¶ 46        In sum, we conclude there exists a reasonable probability the jury would have acquitted defendant of first degree murder had the illegally recorded phone call been excluded at trial. Accordingly, we reverse defendant's conviction for first degree murder.

¶ 47        Regarding defendant's UUWF conviction, we come to the opposite conclusion. To sustain this conviction, the State was required to prove defendant, having been previously convicted of a felony, knowingly possessed a firearm and firearm ammunition. 720 ILCS 5/24-1.1(a) (West 2020). Both Dorris's and defendant's testimony, along with the certified copy of defendant's prior felony conviction, established beyond any doubt defendant committed UUWF. See *Rolandis G.*, 232 Ill. 2d at 43. Accordingly, the erroneous admission of the recording was harmless regarding defendant's UUWF conviction.

¶ 48        For the foregoing reasons, we affirm defendant's conviction for UUWF, reverse defendant's conviction for first degree murder, and remand that charge for further proceedings.

16

Because we have reversed defendant's first degree murder conviction, we need not address the remaining issues brought forth by defendant regarding that charge.[1]

¶ 49                                    III. CONCLUSION

¶ 50         We affirm in part and reverse in part the judgment of the circuit court of Will County, and we remand the cause for further proceedings.

¶ 51         Affirmed in part and reversed in part.

¶ 52         Cause remanded.

---

[1]While defendant requests a reversal of both convictions in some of his other issues, none of his arguments specifically addresses the integrity of his UUWF conviction.